In re REAPPORTIONMENT OF the
COLORADO GENERAL
ASSEMBLY.

No. 82SA6.

Supreme Court of Colorado,
En Banc.

Feb. 19, 1982.

Rehearings Denied March 1, 1982.

**192**

Ralph A. Cole, Denver, pro se objector.

Gerald Dahl, Frisco, and Arnold Alperstein, Alperstein, Alperstein & Forman, P. C., Denver, for certain residents of Eagle, Grand, Jackson, Pitkin, Routt, Summit, Boulder, Gilpin, Jefferson and Clear Creek Counties.

Jac K. Sperling, Denver, for Raymond Bullock (Jefferson County Resident) and Jeanette Scotland (Boulder County Resident).

Gary Sandblom, Denver, for Michael T. Rabb and Jay Brizie (Boulder County Residents).

James R. Stitt, Rodney R. Nowadzky, Stitt, Wittenbrink & Nieman, Westminster, for City of Westminster.

Wyatt B. Angelo, Russell, Angelo & Wright, P. C., Gunnison, for Consolidated Gunnison County Group.

Charles M. Dosh, Denver, for Thomas P. Briggs and William G. DeGroot (Denver County Residents).

Stephen Davis, Denver, for Rae Hilbert and Kathryn L. Pride (Denver County Residents).

Durant D. Davidson, La Junta, for Consolidated Otero County Group.

Cile Pace, Asst. County Atty., Jefferson County, for Norman C. Allen, Jefferson County Clerk and Recorder.

Alfred J. Romano, Chairman, Larimer County Republican Party, Daniel A. Campbell, Jesse T. and Anne M. Kelsey, Eldorado Estates Homeowners Ass'n, Inc. (Jeffrey Waller, Acting President), Charles L. Dunahue, Republican Captain, Dist. No. 1, Katherine E. Lillich, Republican Captain, Dist. No. 1, Lucio Rodriguez, Republican Captain, Dist. No. 2, Edna Shellhammer, Republican Captain, Dist. No. 2, Robert W. Terry, Phillip and Barbara Fresquez, Lila D. Greaves, pro se protestors.

Jon L. Holm, Holm & Christensen, Leonard M. Campbell, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, for Colo. Com'n on Reapportionment.

PER CURIAM.

The sections of the Colorado Constitution establishing a system for reapportionment of the General Assembly to reflect population changes in the 1980 federal census require us to review the reapportionment plan. *Colo.Const.* Art. V, §§ 46, 47 and 48.[1] We conclude that the plan adopted by the Colorado Reapportionment Commission (Commission)[2] complies with the criteria in

---

1. *Colo.Const.* Art. V, § 48(1)(e) requires this Court to adopt procedures for review of the plan. Rules for Reapportionment Commission Proceedings, Vol. 7B, C.R.S.1973 (1981 Supp.).

2. *Colo.Const.* Art. V, § 48(1)(a) provides: "After each federal census of the United States, the senatorial districts and representative districts [of Colorado] shall be established, revised, or altered, and the members of the sen-

*Colo.Const.* Art. V, §§ 46 and 47. However, a portion of the plan which establishes the sequence of elections in Senate Districts 13 and 34 does not conform to constitutional requirements, and we disapprove that portion.

■ The paramount criterion for testing the constitutional sufficiency of a reapportionment plan is substantial equality of population among the senate districts and among the house districts[3] as required by *Colo.Const.* Art. V, § 46:

The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population as nearly equal as may be, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.[4]

*Colo.Const.* Art. V, § 47 contains three additional criteria for evaluating the composition of legislative districts. Section 47(1) provides in part: "Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible."[5] In *Acker v. Love,* 178 Colo. 175, 496 P.2d 75 (1972), "compact" is defined:

Compactness as used in the constitutional sense . . . concerns a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered, allowing for variance caused by population density and distribution, census enumeration districts, and reasonable variations necessitated by natural boundaries and by county lines.

496 P.2d at 76.

Section 47(2) provides in pertinent part: Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible.

By its express language, section 47(2) subordinates the importance of not dividing

---

ate and the house of representatives apportioned among them, by a Colorado reapportionment commission. . . ."
The constitutional reapportionment procedure which preceded the present system placed the responsibility for redistricting with the General Assembly. *Colo.Const.* Art. V, § 48 (prior to 1974 amendments). For a history of reapportionment in Colorado, *see Lisco v. Love,* 219 F.Supp. 922 (D.Colo.1963) *rev'd sub nom. Lucas v. Forty-Fourth General Assembly,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

3. The Colorado Senate has 35 members, one elected from each senatorial district. The House of Representatives has 65 members, one elected from each house district. *Colo.Const.* Art. V, § 45. Section 2–2–501, C.R.S.1973 (1980 Repl.Vol. 1B) (1981 Supp.).

4. The five percent deviation test means that the sum of the percent by which the largest district's population exceeds that of the ideal district and the percent by which the smallest district population falls short of the population of the ideal district must be less than five percent.
The senate districts in the reapportionment plan vary in population from a low of 81,144 to a high of 84,246. The "ideal" senate district would have a population of 82,570, obtained by dividing the population of Colorado by 35, the number of senate districts. The population of the largest senate district exceeds that of the ideal district by 2.03%. The population of the smallest senate district falls short of that of the ideal district by 1.73%.
The house of representatives districts in the reapportionment plan vary in population from a low of 43,466 to a high of 45,662. The "ideal" house of representatives district would have a population of 44,461, obtained by dividing the population of Colorado by 65, the number of house districts. The population of the largest house district exceeds that of the ideal district by 2.70%. The population of the smallest house district falls short of that of the ideal district by 2.24%. All districts are within the five percent deviation limits. Thus, the reapportionment plan satisfies *Colo.Const.* Art. V, § 46.

5. This provision also requires that each district consist of "contiguous whole general election precincts" and that districts of the same house not overlap. No one challenges the plan on either of these bases.

counties to the substantial equality of population mandate of section 46. *See generally Lucas v. Fourty-Fourth General Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) (state constitutional provision apportioning state senate based on factors other than population violated 14th amendment equal protection clause).

The final test for the constitutional adequacy of legislative districts is the communities of interest standard in *Colo.Const.* Art. V, § 47(3):

> Consistent with the provisions of this section and section 46 of this article, communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, shall be preserved within a single district wherever possible.

The language "Consistent with the provisions of this section and section 46 ... " as a preface to the communities of interest test in section 47(3) clarifies that maintenance of communities of interest is the least weighty of the requirements in sections 46 and 47.

■ Our role in this proceeding is a narrow one: to measure the present reapportionment plan against the constitutional standards.[6] The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court. We emphasize, however, that a basic purpose of the constitutional standards is to assure equal protection for the right to participate in the Colorado political process and the right to vote. *See. Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Lucas v. Forty-Fourth General Assembly of Colorado, supra.* Testimony before the Commission justifying districts of unequal population would not shield a plan allowing unequal districts from judicial invalidation; deference to Commission expertise and judgment would be inappropriate in such a case.

We recognize the difficulty the Commission faces in complying simultaneously with multiple constitutional criteria which may conflict in application. When the greatest potential for conflict exists, the constitutional provisions explicitly note which criterion takes precedence. Thus, *Colo.Const.* Art. V, § 47(2) makes the prohibition against splitting counties subordinate to the requirement of section 46 that each legislative district have equal population. Likewise, section 47(3) makes clear that the preservation in a single district of discrete communities of interest is of lesser import than the other criteria of sections 46 and 47. We also recognize that the criteria of sections 46 and 47 are to be viewed as a whole, as a set of firm but general guidelines which allow the Commission some discretion in application. With these general considerations in mind, we review the Commission's plan. Objections to the plan and proposed alternate plans were submitted in accord with our procedural rules; however, we do not limit our review of the plan to the districts which were the subject of specific objections.

### I.

■ Initially, we consider a general objection that the plan is void because the preliminary reapportionment plan was not published as required by *Colo.Const.* Art. V, § 48(1)(e), which provides in pertinent part:

> Within ninety days after the commission has been convened or the necessary census data are available, whichever is later, the commission *shall publish a preliminary plan* for reapportionment of the members of the general assembly and shall hold public hearings thereon in several places throughout the state within forty-five days after the date of such publication.

(Emphasis added.)

The affidavit of the Commission's staff director reflects that the Commission held

---

**6.** The proceeding is meant to be swift and limited in scope so that elections from the new districts may proceed on schedule. *See* Rules for Reapportionment Commission Proceedings. Vol. 7B, C.R.S.1973 (1981 Supp.). One of the

objectors challenged the reapportionment provisions of the Colorado Constitution as conflicting with the United States Constitution. Such a challenge is not within the ambit of justiciable issues in this reapportionment review.

19 local and regional hearings and two statewide hearings on the preliminary plan between November 2, 1981 and December 7, 1981. Two weeks or more before each hearing, the Commission mailed a hearing schedule and relevant local and statewide maps showing the proposed new legislative districts to the affected county clerks and recorders, Democratic and Republican county chairpersons, and newspapers and radio stations serving the areas in which the hearings were to be held. Technical descriptions of the proposed districts also were sent to clerks and recorders and party chairpersons. The Commission issued press releases announcing the hearings and soliciting public comment on the preliminary plan. Thereafter, the Commission held its hearings and received public comment.

The constitutional provision does not specify any particular method of publication of the preliminary plan. When newspaper publication is contemplated, the constitution makes it clear, directly or by reference. *See Colo.Const.* Art. V, § 1; *Colo. Const.* Art. XIX, § 2; *Colo.Const.* Art. XXIII, § 1; *Colo.Const.* Art. XX, §§ 4, 5. In other cases, when newspaper publication is not specified, a reference to publication will not necessarily require a legal notice in a newspaper. *See Colo.Const.* Art. XVIII, § 8; *Colo.Const.* Art. V, § 13.

We conclude that the word "publish" in *Colo.Const.* Art. V, § 48(1)(e) has its commonly understood meaning, *i.e.,* "to declare," "to make generally known," "to make public announcement of," "to place before the public," *Webster's Seventh New Collegiate Dictionary*; "to make public; to circulate; to make known to people in general," *Black's Law Dictionary* (rev. 4th ed. 1968). The purpose of publication of the preliminary plan is to make the public aware of the plan and to encourage comment to the Commission about it. The Commission's notice procedure and dissemination of the preliminary plan was sufficient to "publish" it in compliance with *Colo.Const.* Art. V, § 48(1)(e).

## II.

### A.

■ Several opponents attack the plan claiming that, in failing to preserve intact Montezuma, Otero, Eagle, Gunnison and Fremont counties, the plan violates the requirement of *Colo.Const.* Art. V, § 47(2), which provides in pertinent part:

Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts.

We disagree. From our examination of the plan in conjunction with the Commission's Report, we conclude that the Commission was sufficiently attentive to county boundaries to meet the requirement of section 47(2).

Examining the plan as a whole, of the 53 counties in Colorado with populations less than that of an ideal senate district, only one, Delta County, was split in the plan. The Commission's justification for the division of Delta County between more than one senate district was the need to achieve sufficient population in Senate Districts 5 and 6 to meet the equal population requirement of section 46. The same number of counties—53—are too small to each comprise a single house district. Of these, only seven were divided between more than one house district. The Commission's justification for splitting six of the seven—Montezuma, Otero, Eagle, Delta, Gunnison and Elbert counties—was to add sufficient population so that house districts could be formed incorporating adjoining counties intact.

Of the small counties which were divided into more than one house district, only the division of Fremont County was justified on a basis other than equal population. The Commission placed northwestern Fremont County in a house district with several small mountain counties to preserve a "unique community of interest" and tied the Canon City portion of Fremont County to Pueblo because of "the U.S. 50 transportation corridor and major state facilities [providing] a common employment base."

Although the Commission's arguments to this Court and the objections of opponents to the plan focus on the preservation of "small" county boundaries, the language of section 47(2) is not limited to counties smaller than one legislative district. It merely states that "[e]xcept when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts." Of the ten "large" counties with population sufficient to sustain one or more senate districts,[7] only Mesa County, which is encompassed in one district, Adams County, comprising three districts, and Denver, comprising six, are not divided and incorporated into districts with all or part of other counties.

For the most part, the Commission justified this splitting of "large" counties in forming senate districts by the need to meet equal population requirements.[8] In the metropolitan areas, where the Commission had to combine parts of counties which already contain one full district with adjoining counties, and the population is dense enough to allow the lines to be drawn in a number of ways without offending section 47(2), the Commission relied more often on the rationale of preserving communities of interest.

El Paso County's population requires that it be composed of more than three senate districts, but it must be combined with Elbert, Lincoln and Teller counties to support four senate districts. Because any changes in election laws or voting practices in El Paso County must be approved in accordance with the Voting Rights Act of 1965, 42 U.S.C. § 1971 *et seq.* (1976), the Commission began its division of the county by drawing a district primarily in Colorado Springs to insure that minority voting strength would not be diluted in a discriminatory fashion. The Commission then joined each of the three adjoining counties with a separate part of El Paso County to form the three remaining districts. It might have been possible for the Commission to draw three of the districts within the El Paso County boundaries, leaving sufficient population from El Paso County to combine with all of Teller, Lincoln and Elbert counties to form a fourth district. However, no one objected to us about the El Paso County plan, the lines were drawn to achieve equal population, and, absent a clear constitutional violation, we should not substitute our judgment for that of the Commission.

Turning to the house districts in the larger counties, we note that El Paso and Denver counties support their allotted house districts without the addition of population from outside their boundaries. However, portions of Adams, Arapahoe, Boulder, Jefferson, Larimer, Mesa, Pueblo and Weld counties were added to other counties or each other to form house districts. The only objections before us to the crossing of county boundaries to form house districts involving a larger county are those by Fremont and Otero residents to their inclusion with portions of Pueblo County. It is impossible for us to ascertain in larger counties whether different district configurations might result in a net reduction in the number of house districts which cross county lines.

Each detail of the reapportionment plan which we might disapprove would require the Commission to make changes which have a "ripple effect," necessitating numerous other changes in the reapportionment scheme. *In re Interrogatories by the General Assembly,* 178 Colo. 311, 497 P.2d 1024 (1972). We are mindful that the time constraint in section 48 will not allow the Commission to conduct new hearings on the Commission's revisions resulting from a dis-

---

7. Adams, Arapahoe, Boulder, Denver, El Paso, Jefferson, Larimer, Mesa, Pueblo and Weld counties fall in this category.

8. An example is the division of Weld and Larimer counties, the combined population of which is in excess of that required for three senate districts. The Commission shifted the excess population of Larimer County to a northwestern Colorado district and of Weld County to a northern plains district, leaving each county with an entire senate district and a district shared by the two counties.

approval.[9] Although we might make different choices were we in the Commission's place, we should not substitute our judgment for the Commission's unless we are convinced the Commission departed from constitutional criteria. In many instances that determination may be one of degree. We note, for example, that the court-approved plan for reapportionment in 1972, measured under the previous version of Colo.Const. Art. V, § 47[10] included senate districts which divided *six* small counties and house districts which divided *eleven* small counties. *In re Interrogatories by the General Assembly, supra.*

The constitution allows the Commission to divide a county only if necessary to meet the equal population requirement. The Commission's justification for some of the county divisions in the plan before us is not as precise as it might be. Nevertheless, substantial equality of population and avoidance of splitting counties cannot always be met simultaneously. When they cannot, the avoidance of split counties must yield. The area of the state in which these conflicts occur is subject to adjustment, and the Commission must have the discretion to choose where the necessary and constitutionally permissible compromises are made. Here, the Commission substantially complied with the constitutional requirements. *In re Interrogatories by the General Assembly, supra.*

### B.

■ Several objectors contend that the Commission violated the prohibition against splitting cities in *Colo.Const.* Art. V, § 47(2), which provides in pertinent part:

Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible.

Two residents of the City of Boulder maintain that its division into more than one senate district and the division of Grand Junction into more than one house district, when the population of each is sufficient to support a single district, is unconstitutional. Officials of Westminster, although acknowledging the city's irregular boundaries and location in two counties, request that its division among seven house districts and four senate districts be reduced to five house districts and two or three senate districts. Neither challenge convinces us that the Commission failed to adhere to constitutional standards in the exercise of its discretion.

Within Denver, objectors questioned the compactness of House Districts 6, 9, 10 and 11 and the communities of interest in House Districts 6, 7 and 9 and Senate Districts 31, 32 and 35. Preservation of communities of interest is a constitutionally recognized ideal which may not always be achievable. Again, after reviewing the objections, we conclude that the Commission acted within the bounds of its authority and discretion in drawing house district boundaries in Denver. Other objections based on lack of compactness or failure to preserve communities of interest, primarily in the inclusion of western Larimer County in Senate District 8 and the inclusion of mountain and suburban residents in House District 53, while not without some logical basis, also fail to demonstrate that the Commission improperly applied constitutional criteria.

9. *Colo.Const.* Art. V, § 48(1)(e) provides in relevant part:

"If the plan is returned [by the supreme court], the commission shall revise and modify it to conform to the court's requirements and resubmit the plan to the court within twenty days. If the plan is approved by the court, it shall be filed with the secretary of state for implementation no later than March 15 of the second year following the year in which the census was taken."

*See also* Rules for Reapportionment Commission Proceedings, Vol. 7B, C.R.S.1973 (1981 Supp.).

10. *Colo.Const.* Art. V, § 47, in effect in 1972, provided:

"Except when declared by the general assembly to be necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts."

## III.

As several objectors called to our attention, the plan draws the boundaries of Senate District 34 to encompass the residences of two incumbent state senators, while no state senator resides within Senate District 13. The term of one of the incumbents expires in 1982, the term of the other in 1984. As part of the plan, and under section 2–2–503, C.R.S.1973 (1980 Repl.Vol. 1B) (1981 Supp.), the Commission designated the senate districts in which state senators shall be elected in the November 1982 general election, and every four years thereafter, and the senate districts in which state senators shall be elected in the November 1984 general election, and every four years thereafter. That designation sets an election in district 34 in 1982 but no senatorial election in district 13 until 1984. The result is that until 1985 no senator will reside in district 13, but two will reside in district 34. We agree with the objectors that such a result violates constitutional guarantees of legislative representation.[11]

■ At the outset, we note that equal protection is not denied because district 13 is scheduled to elect a state senator in 1984, whereas, in the absence of reapportionment, some residents of that district would have voted for a state senator in 1982. Although reapportionment and election scheduling should preserve wherever possible the opportunity of all citizens to vote for a state senator every four years, the complexities of the reapportionment process may result occasionally in a six-year delay of the opportunity of some persons to vote for a senator. Where this result is absolutely necessary, it does not constitute a constitutional deprivation unless the change is shown to be the result of an invidious discrimination. *See Ferrell v. Hall*, 339 F.Supp. 73 (D.C.Okla.1972) *aff'd mem.* 406 U.S. 939, 92 S.Ct. 2045, 32 L.Ed.2d 328 (1972); *Stout v. Bottorff*, 249 F.Supp. 488 (D.C.Ind.1965); *McCall v. Legislative Assembly*, 291 Or. 663, 634 P.2d 223 (1981). *But see Schaefer v. Thomson*, 251 F.Supp. 450 (D.C.Wy.1965), *aff'd mem.* 383 U.S. 269, 86 S.Ct. 929, 15 L.Ed.2d 750 (1969).

■ The complaint of the objectors, however, is not directed merely to the six-year lapse between senatorial elections for some of the citizens of district 13, but to the constitutionally significant fact that during the last two years of this period the residents of district 13 will not have an identifiable senatorial representative. Such a result cannot be sanctioned consistent with the requirements of our state constitution.

*Colo.Const.* Art. V, § 48 provides that following the federal census, "the senatorial districts and representative districts shall be established, revised, or altered, *and the members of the senate and the house of representatives apportioned among them . . . .*" (emphasis added). This constitutional mandate is not an empty maxim that

---

11. The objectors also argue that the plan violates the "one-person one-vote" guarantee of *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Reynolds*, the United States Supreme Court addressed the failure to apportion seats in the Alabama legislature on the basis of population which resulted in the vote of an elector in a more populous district carrying less weight than the vote of an elector in a more sparsely settled district. The Court found that this dilution of the weight of a citizen's vote violated the right to equal protection of the laws. *U.S.Const.*, amend. XIV. *See WMCA, Inc. v. Lomenzo*, 377 U.S. 633, 84 S.Ct. 1418, 12 L.Ed.2d 568 (1964); *Maryland Committee for Fair Representation v. Tawes*, 377 U.S. 656, 84 S.Ct. 1429, 12 L.Ed.2d 595 (1964); *Davis v. Mann*, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964); *Roman v. Sincock*, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964);

*Lucas v. Forty-Fourth General Assembly of Colorado*, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964) (companion cases to *Reynolds*).

In the instant case, however, the objectors do not contend that voters in district 13 will suffer a dilution of their suffrage right as a result of population variances between districts. Neither is any suggestion made that the present incumbents elected by the residents of district 13 will not be permitted to serve their full term in office, *see* section 2–2–504, C.R.S.1973 (1980 Repl. Vol. 1B) (1981 Supp.), or that when elections are held in 1984 the residents will not receive their proportionate voice in state government. Rather, the contention of the objectors is directed to the timing and not the weight of their vote, a contention not directly controlled by *Reynolds v. Sims, supra*, and its progeny.

districts are to be allocated a seat in the general assembly which may or may not be filled for a period of time. Rather, it is a guarantee that all citizens will receive an identifiable representative as a result of either a resident holdover senator [12] or the election of a new senator upon implementation of the reapportionment plan. A contrary construction, which would allow a district to remain unrepresented for two years, would not only offend this provision of the constitution and fundamental notions of democratic representation, but would also be inconsistent with the system of representative government contemplated in other provisions of our constitution.

*Colo.Const.* Art. II, § 24 guarantees the right of the people to petition "those invested with the powers of government for the redress of grievances." While that right does not limit citizens to petitioning only those representatives for whom they have voted, it is clear that legislators will be most responsive to citizens who place them in office and who, more importantly, reserve the power to remove a particular legislator from office during his term or return him to office by reelection. Full protection of this constitutional right requires that each district have an identifiable representative at all times.

Our conclusion is also buttressed by reference to the recall power reserved to the people in *Colo.Const.* Art. XXI, § 1: "Every elective public officer of the State of Colorado may be recalled from office at any time by the *electors entitled to vote for a successor of such incumbent....*" (emphasis added). The residents of district 13 will not be able to recall the state senators for whom they originally voted because, as a result of the reapportionment, those senators are located in other districts and the residents of district 13 would not be entitled to vote for the successor of the recalled

representative; nor will they be able to exercise the recall power over a new senator representing district 13, since, under the present reapportionment plan, none will exist. A reapportionment plan which virtually nullifies these important constitutional powers cannot be constitutionally sanctioned, at least where that result can be readily avoided. *See McCall v. Legislative Assembly, supra* (reapportionment plan requiring district to go unrepresented for two years invalidated under similar provisions of Oregon constitution).

The election sequencing in these two districts is particularly unjustifiable in light of a constitutionally preferable and easily implemented alternative. The election schedules established by the Commission provide for a senatorial election in district 34 in November 1982. As a result, two senators, a holdover senator and the victor in the 1982 election, will represent district 34 from 1983 to 1985.[13] This is the same period during which district 13 will not be represented. If the Commission were to switch the election dates for districts 13 and 34, each district would be represented by a single senator from 1983 to 1985. We simply note this as a preferable solution. It is not our role to mandate a particular solution and we leave that for the Commission's decision, guided by the reasons we express for disapproval.

We reject one feature of the reapportionment plan, the sequencing of elections in Senate Districts 13 and 34, and return the plan to the Commission for revision, modification, and resubmission to this Court as required by *Colo.Const.* Art. V, § 48(1)(e).

LOHR and QUINN, JJ., concur in part and dissent in part.

HODGES, C. J., does not participate.

---

**12.** We do not question the constitutionality of representation of a district by a holdover senator who was not elected by all the voters of the district. *See Ferrell v. Hall, supra; Stout v. Bottorff, supra.*

**13.** The objectors also contend that the provision for two resident state senators in district

34 results in unconstitutional "overrepresentation" of that district. It is unnecessary to address this contention. Because of our holding that each district is entitled to a senator, it necessarily follows that no district will be represented by more than one senator.

LOHR, Justice, concurring in part and dissenting in part.

I.

I agree with the majority opinion's explication of the relative importance of the various constitutional constraints on reapportionment prescribed in *Colo.Const.* Art. V, §§ 46 and 47. The majority's treatment of the publication issue has my approval as well. I also agree with the majority's disapproval of the proposed election sequencing for senate districts 13 and 34, and I join in that part of the majority opinion. However, I do not in all instances agree with its determinations that the other specific provisions of the proposed reapportionment plan are constitutionally adequate, and to that extent I respectfully dissent.

I first elaborate upon the majority's discussion of the scope of our review in this proceeding. While I am not in disagreement with what is said about our role, I believe there are additional points, perhaps implicit in the majority's discussion, which should be made explicit. I then turn to a consideration of the specific features of the present reapportionment plan.

II.

The majority concludes that our role is in one sense narrow. It states, "The choice among alternate plans, each consistent with constitutional requirements, is for the Commission and not the Court." With this I agree.

The majority also concludes that, in another sense, our role is not so deferential. Where there is an alleged or apparent constitutional deficiency in the reapportionment plan, we must exercise careful scrutiny. Our obligation under the constitution would not be satisfied by any less exacting review. Thus, the majority states, "Testi-

mony before the Commission justifying districts of unequal population would not shield a plan allowing unequal districts from judicial invalidation; deference to Commission expertise and judgment would be inappropriate in such a case." I also agree with this statement.

What I would make explicit is that our task is not fully satisfied by assuring that districts are of substantially equal population. Our state constitution imposes additional constraints upon the reapportionment process in *Colo.Const.* Art. V, § 47. Full discharge of our obligation requires that we also assure that these requirements are met. Further, as the majority recognizes, the standards prescribed by *Colo.Const.* Art. V, §§ 46 and 47 do not constitute an undifferentiated set of constraints that the Commission may freely balance against each other. Rather, a clear, if not rigid, hierarchy of precedence is contemplated.[1] Thus, where it is not possible to satisfy all of the criteria prescribed by Art. V, §§ 46 and 47, our task is to insure that the Commission has resolved these conflicts in a manner which protects this constitutionally mandated hierarchy of precedence.

In this connection, I note that the findings of the Commission are entitled to deference. The complex task facing the Commission requires no less. However, when an objector demonstrates to the court, by alternative plan or otherwise, (1) that the Commission could have complied with all the reapportionment requirements where it did not, or (2) that the Commission unnecessarily failed to respect the constitutional hierarchy of precedence, deference to Commission expertise is no longer appropriate. At that point we would be remiss in our responsibility if we did not disapprove the non-complying feature of the plan or, at a minimum, require a further explanation of the Commission's choice.

1. The paramount criterion is substantial equality of population among the senate districts and among the house districts. *Colo.Const.* Art. V, § 46. Subordinated only to this requirement is the proscription contained in *Colo.Const.* Art. V, § 47(2) against the division of counties and cities among districts. Next in order of importance are the standards of compactness and

minimum linear boundary distance found in *Colo.Const.* Art. V, § 47(1). The least weighty of the constitutional requirements is the prescription for preservation of communities of interest. *Colo.Const.* Art. V, § 47(3). By its terms, this requirement is subordinated to the requirements of section 46 and the other requirements of section 47.

Moreover, as the majority concludes, our review of the plan is not limited to those districts which are the subjects of specific challenges. The constitution charges us with review of a reapportionment plan whether or not the issues are framed by opposing parties. Consequently, where our independent review indicates the availability of a constitutionally superior alternative, it may sometimes be necessary to the discharge of our responsibility that we require the Commission to support parts of its plan with findings or other justification. We must be mindful that our task is to determine *independently* whether the plan is constitutionally adequate.

With this framework in mind, I turn to a consideration of the specific provisions of the proposed reapportionment plan. As discussion of those provisions will demonstrate, the majority has inappropriately deferred to the Commission's districting choices in several instances where an objector has shown that the Commission violated constitutional safeguards or that the Commission's choice is so constitutionally suspect as to require disapproval pending further justification.

### III.

I will first discuss those specific objections which in my opinion are clearly meritorious and require disapproval of certain features of the reapportionment plan. To facilitate an understanding of the specific districting problems discussed, maps of the senate districts and house districts as contained in the reapportionment plan are attached as Appendices A and B, respectively.

### A.  Otero County House Districts

The Otero County Democratic and Republican Party Chairmen, The Board of County Commissioners of Otero County, The City or Town Councils of La Junta, Cheraw, Swink, Rocky Ford, Manzanola, and Fowler, The Lower Arkansas Valley Council of Governments, and a number of individual citizens of Otero County have

filed a joint statement of opposition protesting the division of Otero County between house of representatives districts 43 and 63. They contend that this division is not necessary to create substantially equal populations in the house districts and so violates *Colo.Const.* Art. V, § 47(2). I agree.

Otero County is in the lower Arkansas River Valley east of Pueblo. The county seat and principal city is La Junta, situated on the Arkansas River, which runs through the northern part of the county. The reapportionment plan makes that river the dividing line between house districts 43 and 63 in the county. This boundary divides the city of La Junta as well as the county itself.

District 43 is comprised of eastern Pueblo County, and Huerfano, Las Animas and southern Otero Counties. District 63 contains Crowley, Kiowa, Bent, Prowers, and Baca Counties and northern Otero County.

In support of their argument, the Otero County objectors submit two alternate plans. In the first, Otero County would be included entirely within district 43 and eastern Pueblo County would be shifted into district 63. In the second, Otero County would be included entirely within districts 63, and Crowley and Baca Counties would be shifted to district 43. Each alternative plan requires no division of any county except Pueblo, which must be split in any event because it contains a larger population than permissible within a single house district. Each would keep the city of La Junta whole. Although each of the alternatives, and particularly the second, sacrifices compactness to some extent, the more important constitutional requirement that counties not be divided unnecessarily is honored. Each suggested plan is more faithful to the constitution than is the plan adopted. These alternatives may not be the only ones available. Because the reapportionment plan violates *Colo.Const.* Art. V, § 47(2) in dividing Otero County unnecessarily, I would disapprove that portion of the plan.[2]

---

**2.** The majority suggests that the division of Otero County is constitutionally permissible because it is necessary to achieve districts of equal population, a requirement that takes pre-

## B. Mesa County House Districts

Some objectors challenge the Mesa County house district plan on the basis that it unnecessarily places portions of the city of Grand Junction in two different house of representatives districts, 54 and 55. District 54 includes the southern part of Grand Junction and western Mesa County as well as a portion of Delta County. District 55 is made up of the remainder of Mesa County. One alternative which would keep the city of Grand Junction within a single district would create a doughnut configuration, with Grand Junction and adjacent areas as the hole and the remainder of districts 54 and 55 as the doughnut. The Commission's negative response to this suggestion is based on citizens' wishes and a perceived undesirability of splitting urban and rural areas. The constitutional injunction against dividing cities overrides these concerns.

I agree with the objectors that Grand Junction cannot be split between two house districts consistent with *Colo.Const.* Art. V, § 47(2). Therefore, I would disapprove the boundaries of house districts 54 and 55 as presently drawn.[3]

## C. Boulder County Senate Districts

Boulder County is included in three senate districts, 13, 17, and 18. Districts 17 and 18 are entirely within Boulder County, and the City of Boulder, in rough terms, is bisected by the boundary between those two districts. The remainder of Boulder County is in senate district 13, which extends westerly across the continental divide to include Pitkin, Eagle, and Summit Counties as well as Clear Creek and Gilpin Counties on the eastern slope. Senate district 13 will be discussed in a later section.

Certain objectors contend that by splitting the city of Boulder the Commission violated the requirement of *Colo.Const.* Art. V, § 47(2) that when it is necessary to include territory of a county in more than one district of the same house, "the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible." I agree with the objectors.[4]

## D. Adams County Senate Districts

Adams County is divided into three senate districts, 23, 24, and 25. District 24 is a heavily populated area made up of the

cedence over the proscription against splitting of counties, *see* n.1, *supra*. However, I view this reasoning as question begging. *If* the choice is limited to achieving equal population districts or the division of Otero County, then Otero County must be divided. The choice is not, however, so limited. As the alternatives proposed by the objectors demonstrate, it is possible to achieve *both* equal population districts and preservation of the territorial integrity of Otero County. Consequently, this is a situation where the Commission could have complied with multiple reapportionment requirements but did not. Where a constitutionally superior alternative exists, the Commission's proposal cannot be insulated from review simply by invoking the paramount criterion of equal population districts. If that were so, any reapportionment plan would be proper so long as it guaranteed equal population districts, and the additional criteria of *Colo.Const.* Art. V, § 47 would be rendered a nullity.

3. The majority states, "Each detail of the reapportionment plan which we might disapprove would require the Commission to make changes which have a 'ripple effect,' necessitating numerous other changes in the reapportionment scheme." As the question of Grand Junction demonstrates, this is not the case. More-

over, while some "ripple effect" is inevitable because of the interdependent nature of district boundaries, that difficulty cannot by itself insulate the plan from review. It is a relevant but not necessarily controlling consideration. I am aware that reapportionment is a complex and interdependent process, and I believe that, as the majority opinion states, the Commission has on the whole performed admirably. However, our task is not to assess the overall performance of the Commission, but its compliance with the specific constitutional mandates of *Colo.Const.* Art. V, §§ 46 and 47. In response to the objection to division of Grand Junction, the majority states that the challenge does not "[convince] us that the Commission failed to adhere to constitutional standards in the exercise of its discretion." It is not a question of discretion, and it is clear that, in the case of Grand Junction, the Commission did not adhere to constitutional standards.

4. The majority opinion disposes of the division of the City of Boulder on the same basis that it rejects the challenge to the division of Grand Junction. My criticism of that rationale is equally applicable here. *See* n.3, *supra*.

northeastern portion of the Denver metropolitan community, whereas districts 23 and 25 contain the more rural portions of the county, as well as some populous areas. Certain objectors contend that there are a number of alternatives which keep all the cities that lie wholly within the county from being split. This objection is directed to a split of the cities of Federal Heights, Northglenn, and perhaps others. It appears to be well taken, for the boundaries of the three districts could be adjusted within the county to include at least some, and perhaps all, of the cities in question entirely within a single district, while still complying with the equal population requirement. Accordingly, because this plan does not comport with the requirement that the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible, I would disapprove the boundaries drawn for senate districts 23, 24, and 25.

IV.

I now discuss certain districts to which objections having probable merit have been directed. Were this dissenting opinion to prevail I would disapprove the reapportionment plan as to these districts, and require the Commission to pursue and adopt alternatives or to submit a further explanation establishing the constitutional adequacy of the presently proposed districting scheme.

A. Senate District 13

Objectors residing in and near senate district 13 contest the composition of that district as violative of the requirement that communities of interest "be preserved within a single district wherever possible." Colo.Const. Art. V, § 47(3). Other objectors urge that senate district 13 does not satisfy the compactness and minimum boundary distance tests. See Colo.Const. Art. V, § 47(1).

Senate district 13 includes the western slope counties of Pitkin, Eagle, and Summit, the front range mountain counties of Gilpin and Clear Creek, and the western parts of Boulder and Jefferson Counties. It is a long, generally narrow district, extending from the northwest corner of Pitkin County to the northern boundary of Boulder County. The district meets the substantial equality of population requirement and contains no partial county except for Boulder and Jefferson, whose county populations exceed those permissible in a single senate district. It is necessary to determine, however, whether the district impermissibly divides communities of interest, lacks compactness, or has excessively lengthy boundaries.

It cannot be doubted that the interests of the mountain communities and those of the suburbs in the metropolitan area are not the same and sometimes are in tension. Similarly, western slope and eastern slope citizens have divergent interests in some areas appropriate for legislative action. Mining, water, and tourism exemplify subjects in which the residents in senate district 13 could be expected to have strongly held and widely disparate views. A senator predictably will be confronted with dilemmas in efforts to represent citizens with such different interests. The Commission, however, points out the common interests of the mountainous areas, including the skiing industry community of interest bonding western and eastern slope mountain communities. This commonality cannot obscure the other basic differences.

The objectors propose three alternate plans, utilizing various combinations of counties to achieve a senate district 13 limited to the western slope and having a more compact configuration and a shorter periphery. They have no proposal, however, to cope with the "ripple effect" of their suggested changes. That effect could be widespread.

I am mindful of the fact that senate district 13 satisfies the two principal constitutional criteria of substantial equality of population and, except where necessary to achieve equal population, avoidance of split counties. Nevertheless, when the communities of interest are so divided, the district is so lacking in compactness, and its border is

so long, it must be especially clear that the district boundaries adopted reflect the only feasible districting solution consistent with satisfying the principal constitutional criteria. It is no answer to the complaints of a citizen in district 13 that the division of communities of interest to which he is subjected is a rare and isolated occurrence when the reapportionment plan is viewed as a whole. It is constitutionally permissible only if no solution less destructive of constitutional values is reasonably possible.

My review of the supporting materials reflects that senate district 13 was created toward the end of the redistricting process, when the options were narrowest unless lines for other districts, tentatively established earlier, were to be redrawn. While recognizing the difficulty of the Commission's task, I am not persuaded that senate district 13 is "as compact in area as possible," that the "aggregate linear distance [of its boundaries is] as short as possible," *see* Colo.Const. Art. V, § 47(1) or that communities of interest could not have been better preserved. *See Colo.Const.* Art. V, § 47(3). Accordingly, I would disapprove the senate district 13 feature of the reapportionment plan.

The constitutional sufficiency of senate district 8, which adjoins district 13, and which shares a similar west slope-east slope combination is discussed in the immediately following section. I would direct the Commission to consider revision of both districts 8 and 13 to combine western Larimer County with the east slope areas in district 13, recognizing that whether such a combination would be feasible and whether it would ameliorate the constitutional difficulties in the present senate district configuration are matters for the Commission to decide in the first instance. The Commission should not be limited to this possible revision in considering alternatives to remedy the constitutional frailties in districts 8 and 13.

Finally, I would not preclude the Commission from readopting senate districts 8 and 13 in their present configurations if exploration of alternatives should reflect that it is the best compromise available. If this course were adopted, I would direct the Commission to detail the alternatives tested and the reasons it considers other alternatives inferior to the one selected.

*B. Senate District 8*

Certain objectors invite our attention to the inclusion of western Larimer County in senate district 8, contending that it violates the compactness and preservation of communities of interest standards of our constitution.

Larimer County has its county seat in Fort Collins. That city and the southeastern part of the county contain the largest population concentration. Fort Collins and its environs comprise senate district 14, while the rest of southeastern Larimer County is part of senate district 15. The remainder of the county extends westward to the crest of a mountain range dividing Larimer and Jackson Counties and is part of senate district 8.

Senate district 8 is a large, sparsely populated district made up of Moffat, Rio Blanco, Garfield, Routt, Jackson, and Grand Counties, in addition to western Larimer County. It stretches eastward from the Utah border and along the Wyoming border to include more than three-quarters of Larimer County. The lack of common interests —indeed, the probable conflict of interests on subjects such as water policy—between Larimer County and the rest of district 8 is apparent.

The objectors, however, have proposed no alternate plan. If western Larimer County were removed from senate district 8, the ripple effect could be great. As discussed in Section IV A, above, a possible solution is to shift a western slope area now in senate district 13 into senate district 8 and place western Larimer County in senate district 13. Whether such an approach is feasible would require exploration by the Commission, utilizing detailed population information.

Although I recognize that preservation of communities of interest, while of constitutional significance, is subordinate in importance to other criteria, I am not satisfied that senate district 8 as presently constituted represents the alternative most faithful to all the constitutional standards. Therefore, I would disapprove this aspect of the reapportionment plan.

In recognition of the difficulties which senate district boundary revision would involve, and the possibility that further efforts might demonstrate that the existing configuration of senate district 8 is constitutionally the best available alternative, I would not foreclose the Commission from readopting the present district boundaries after diligently attempting to remedy the *Colo.Const.* Art. V, § 47(3) problem created by the present plan. If it were to do so, I would require that it detail the reasons prompting the choice.

## C. Montezuma County House Districts

Objections have been raised to the division of Montezuma County to include it in two house districts, 58 and 59. The population of Montezuma County itself is not large enough to require the split. House district 59 consists of La Plata, San Juan, and Archuleta Counties, and the southern part of Montezuma County. House district 58 lies north of district 59 and includes the counties of Dolores, San Miguel, Ouray, Montrose, and parts of Delta and Montezuma Counties. The objectors demonstrate that the entire counties of Montezuma, La Plata, and San Juan could be combined in district 59; Archuleta County could be transferred to district 60, the San Luis Valley district; and, with adjustments of district lines in the already-split counties of Delta in district 58 and Gunnison in district 60, the constitutionally-mandated substantial equality of population of the affected districts could be maintained.

The Commission justifies the boundaries it selected on the basis of the need to maintain substantial equality of population. Although the objectors present total district population figures which apparently refute this justification, they do not detail the precise district boundary adjustments contemplated in their plan to shift district boundaries in Gunnison and Delta Counties in order to maintain constitutionally appropriate populations in districts 61 and 55, respectively. The objectors' proposal shows promise of closer adherence to the constitutional requirements than does the Commission's proposed plan. Rather than accepting the Commission's undetailed conclusion that the objectors' plan would not be adequate to maintain substantial equality of population, and thus rejecting the challenge to the split of Montezuma County, I would disapprove this feature of the plan unless and until the Commission presents additional information and justification for splitting Montezuma County. Of course, the Commission is not required to accept some particular alternative proposal so long as the plan ultimately adopted meets constitutional requirements.

## D. Gunnison County House Districts

The Gunnison County Chamber of Commerce, the City of Gunnison, the Town of Mt. Crested Butte, the Town of Crested Butte, the Board of County Commissioners of Gunnison County, the Gunnison Chapter of the League of Women Voters, the Gunnison County Republican Central Committee, and the Gunnison County Democratic Central Committee have filed a consolidated statement of opposition, objecting to the division of Gunnison County into two separate house of representatives districts, numbers 60 and 61. They claim that the division is unnecessary and offends the requirements of *Colo.Const.* Art. V, § 47 that counties not be divided, that districts be compact, and that communities of interest be preserved intact.

Gunnison County has the continental divide as its eastern boundary. One major highway, U. S. 50, passes through the county, east to west, providing access to Salida on the east and Montrose on the west. The city of Gunnison is the major population center and county seat and is located on U.

S. 50. Highway 135 goes north from Gunnison to Crested Butte and Mt. Crested Butte, the areas having the second and third largest populations in the county. There is no paved road beyond these communities. The line describing the northwest boundary of the county was drawn without reference to topography, for the small communities of Marble and Somerset are divided from the rest of the county by mountains and lack direct highway access to the county seat of Gunnison.

House district 60 includes the city of Gunnison. Crested Butte and Mt. Crested Butte are in district 61, as are Marble and Somerset. District 60 is made up of the San Luis Valley counties of Saguache, Alamosa, Conejos, Rio Grande, and Costilla; the mountain counties of Mineral and Hinsdale; and a fractional portion of Gunnison County. House district 61 is made up of the upper Arkansas River Valley Counties of Lake, Chaffee, and a portion of Fremont; the mountain counties of Park, Teller, and Custer; and the remaining section of Gunnison County.

The house district lines in Gunnison County do not maintain the county whole, even though the population of Gunnison County is not large enough to require division. They divide the community of interest that has developed in the Gunnison-Crested Butte areas as a result of the relationships promoted by the topography. The central question is whether the division of the county can be justified as necessary to meet the equal population requirements of *Colo.Const.* Art. V, § 46.

The Gunnison County objectors, claiming that the house districting in their county violates the constitution, propose alternate plans which they assert would be more consistent with constitutional criteria. One alternative is to include all of Gunnison County in district 61, and to make the compensating adjustment in the population of district 61 by eliminating Custer County, Fremont County, and part of Park County. The division of Park County is reasonable,

they argue, because Park County extends east of Kenosha Pass, and the portion east of the pass has a natural community of interest with the mountainous areas of western Jefferson County.

To make up the population lost to district 60, Custer County and the part of Fremont County dropped from district 61 could become part of district 60. A second suggested alternative to make up the loss in district 60 is to add Huerfano County and to compensate for the loss of that county to district 43 by including Fremont and Custer Counties with the Pueblo County districts, and transferring necessary amounts of the Pueblo County districts to district 43.

Another proposal by the objectors to unify Gunnison County would include it in district 60, move Costilla County into district 43, and make unspecified compensating adjustments in the Pueblo County districts and in Fremont County to maintain substantial equality of population in all affected districts.

The unfortunate division of Gunnison County house districts in the reapportionment plan, and the proposals offered to unite the county, vividly illustrate the difficulties of the task which the Commission has accomplished, the deviations from the constitutional ideal necessary in redistricting this state, and the ripple effect of proposed changes. Even so, I conclude that the alternatives proposed by the Gunnison County groups indicate that the house redistricting in Gunnison County could be accomplished in a way more faithful to the constitutional criteria. In view of the substantial adverse effect of the plan on Gunnison County, I would disapprove this feature of the reapportionment plan. Again, I would not preclude the Commission from readopting the present plan if upon further study and consideration it were to determine that constitutional standards are more adversely affected by the alternative possibilities and by any other alternative which the Commission could devise to remedy the defects of the present proposal. In such

event, I would require that the Commission detail the reasons it has chosen to readopt the present plan for our independent evaluation.

### E. Fremont County House District

The principal area of Fremont County has been included in house district 61 with Lake, Park, Teller, Chaffee, and Custer Counties and part of Gunnison County. A small segment, containing Canon City, Fremont County's principal population center and county seat, has been included in district 44 with western Pueblo County, including part of the city of Pueblo. The objectors illustrate that Fremont County could be left whole and combined with Custer County and the northwestern part of Pueblo County to make up district 44. District 61 could then be made up of Park, Teller, Lake, Chaffee, and a larger part of Gunnison County than now included, all while maintaining populations within the required standards. The Commission does not respond specifically to this proposal. Its argument reflects an impermissible preference for maintenance of perceived communities of interest over the constitutionally preferred value of maintaining counties whole. Because of the ripple effect, it is again unclear whether the objectors' plan is indeed workable. Whether it is the best alternative is not for us to determine in the first instance. It indicates, however, that splitting Fremont County between two house districts was unnecessary, and so constitutionally impermissible. I would disapprove this portion of the reapportionment plan.[5]

### V.

The majority notes, and properly so, that our review of the reapportionment plan under *Colo.Const.* Art. V, § 48 is not limited to districts which are the subjects of specific objections. My examination of the plan, however, reflects that the Commission had an awareness of the governing criteria and adopted district boundaries by application of those criteria. No departure from the constitutional requirements is apparent from the face of the plan as it relates to those districts which were not the subject of specific challenges, although it appears that in certain instances some constitutional ideals were forced to yield in favor of adherence to standards of greater constitutional significance. (*E.g.*, the Commission split Elbert County between house districts 40 and 64 to maintain substantial equality of district populations.) For present purposes, I accept the majority's conclusion that the uncontested districts were properly constituted.

### VI.

Finally, I am aware that some suggested means of obtaining closer adherence to constitutional districting standards, as set forth in this opinion, may be inconsistent with others. Were my views to prevail, I would require no more than that, when confronted with conflicting choices in revising and modifying the plan, the Commission adopt the alternatives most faithful to constitutional standards, guided by the reasons expressed for disapproval of features of the plan as originally submitted, and that it explain the bases of its choices.

For the reasons stated, I would reject certain features of the reapportionment plan, as more particularly described above, and return the plan to the Commission for revision, modification, and resubmission to this Court as required by *Colo.Const.* Art. V, § 48(1)(e).

QUINN, J., joins in this concurring and dissenting opinion.

---

5. The majority states that Fremont County was divided to preserve a community of interest. This is an impermissible inversion of the hierarchy of constitutional requirements which the majority itself articulates. While the division of Fremont County might ultimately prove necessary to secure districts of equal population, that division cannot constitutionally be justified simply to maintain a perceived community of interest. *See* n.1, *supra.*

APPENDIX "A"

COLORADO REAPPORTIONMENT COMMISSION
PLAN B
SENATE DISTRICTS