**In re Reapportionment of the
COLORADO GENERAL
ASSEMBLY.**

**No. 92SA19.**

Supreme Court of Colorado,
En Banc.

March 13, 1992.

C. Lennahan, Denver, for the Colorado Reapportionment Com'n.

Charles H. Richardson, Christopher K. Daly, Aurora, for the City of Aurora.

Luis A. Corchado, Denver, Manuel I. Lopez, Alamosa, Motz, Gonzales and Martinez, Martin A. Gonzales, Alamosa, for the Hispanic League.

Holland and Hart, John C. Barajas, Denver, for the Colorado Hispanic Bar Ass'n.

Steven R. Ruddick, Aurora, amicus curiae, Schmidt and Schmidt, Mark H. Schmidt, Springfield, for Bd. of County Com'rs of Baca County.

Steven G. Keppers, pro se.

Menola N. Upshaw, pro se, Denver, for the Nat. Ass'n for the Advancement of Colored People, Denver Branch.

Dr. Lawrence E. Lewis, pro se, Denver, for the Colorado–Wyoming State Conference Branches of the Nat. Ass'n for the Advancement of Colored People.

Rev. Oscar S. Tillman, pro se, Denver, for the Legal Redress Staff.

Harden, Schmidt, Hass & Haag, P.C., George H. Hass, Assistant Larimer County Atty., Fort Collins, for the Bd. of County Com'rs, Larimer County and Larimer County Clerk and Recorder.

Gerie Grimes, pro se, Denver, for the Colorado Black Roundtable, Inc.

Charles R. Duke, State Representative, pro se, Denver, for House District 20.

Jeanne M. Adkins, State Representative, pro se, Denver, for House Dist. 40.

John M. Ely, Asst. Pitkin County Atty., Aspen, for Pitkin County Bd. of County Com'rs.

Fossum, Hatter & Green, P.C., James Hatter, Cortez, for Bipartisan Committee to Keep Montezuma County Whole.

James D. Robinson, Asst. Adams County Atty., Brighton, for the Adams County Clerk and Recorder, Robert Sack.

Zak, Fox, Pehr and Fuller, P.C., Richard L. Fuller, David W. Pehr, Westminster, for Joan M. Johnson, Sheryl L. Pehr, and Amanda S. Pehr.

Holme, Roberts & Owen, Daniel S. Hoffman, Daniel J. Dunn, Stephen P. Ward, Colorado Reapportionment Com'n, Rebecca

Rick DeWitt, Englewood City Atty., Englewood, for the City of Englewood.

Grant, Bernard, Lyons & Gaddis, P.C., Daniel F. Bernard, Suzan D. Fritchel, Longmont, for the Arapahoe County School Dist. No. 1.

Martin R. McCullough, Westminster City Atty., Westminster, for the City of Westminster.

Davis, Graham & Stubbs, Gale T. Miller, Richard A. Westfall, Denver, Pryor, Carney and Johnson, Pamela J. Fair, Englewood, for Jennie Sanchez, Adeline Sanchez & Esther Grant.

Wilma M. Taylor, pro se, Denver, for the Colorado Black Women For Political Action.

Peter Lawrence Vana, Arapahoe County Atty., Darrel L. Matteson, Asst. County Atty., Robert Lembke, Special Asst. County Atty., Littleton, for the Arapahoe County Com'r.

Trimble, Tate and Nulan, P.C., Penfield W. Tate III, Penfield W. Tate II, Bernard L. Black, Jr., Denver, for the Blacks for Fair Reapportionment.

Hayes, Phillips & Maloney, P.C., John E. Hayes, Denver, for the City of Sheridan, and the Individually Named Registered Electors and Elected Officials.

Miller & Delay, P.C., Reese Miller, Westminster, for the Sheridan School Dist.

Davis, Graham & Stubbs, Stephen H. Kaplan, Dan Friesen, Denver, For Michael Henry, Selma Lock, Bob Dean, Fern Osborne, Doug Franssen, Maureen H. Loyacono, Pat Sullivan, Alvin J. Koops, Richard Newlon, Denver Democratic Party, Warren Weston, Helen C. Shreves, Jane Werner, Art Binkley, Joann Ortega, Gail Glover, Jane Craft, Betty Spindler, Bob Goss, Cecily Jones, Judy Mays, Mary Gibson, June & Leonard Hurst.

H. Lawrence Hoyt, Boulder County Atty., Boulder, for Boulder County Clerk and Recorder.

Reta A. Crain, Douglas County Clerk and Recorder, pro se.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Jan Michael Zavislan, Asst. Atty. Gen., Denver, for Natalie Meyer, Secretary of State of Colo.

Larry W. Sarner, pro se.

Justice ERICKSON delivered the Opinion of the Court.

This original proceeding under article V, section 48(1)(e), of the Colorado Constitution requires us to review the Final Plan submitted by the Colorado Reapportionment Commission (Final Plan) and determine whether the plan complies with sections 46 and 47 of article V.[1] A number of

---

1. Section 48 of Article V of the Colorado Constitution provides, in part:

**Section 48. Revision and alteration of districts—reapportionment commission.** (1)(a) After each federal census of the United States, the senatorial districts and representative districts shall be established, revised, or altered, and the members of the senate and the house of representatives apportioned among them, by a Colorado reapportionment commission consisting of eleven members, to be appointed and having the qualifications as prescribed in this section. Of such members, four shall be appointed by the legislative department, three by the executive department, and four by the judicial department of the state.

. . . .

(e) Within ninety days after the commission has been convened or the necessary census data are available, whichever is later, the commission shall publish a preliminary plan for reapportionment of the members of the general assembly and shall hold public hearings thereon in several places throughout the state within forty-five days after the date of such publication. Within forty-five days after the completion of such hearings, the commission shall finalize its plan and submit the same to the Colorado supreme court *for review and determination as to compliance with sections 46 and 47 of this article.* Such review and determination shall take precedence over other matters before the court. The supreme court shall adopt rules for such proceedings and for the production and presentation of supportive evidence for such plan. The supreme court shall either approve the plan or return the plan and the court's reasons for disapproval to the commission. If the plan is returned, the commission shall revise and modify it to conform the court's requirements and resubmit the plan to the court within twenty days. If the plan is approved by the court, it shall be filed with the secretary of state for implementation no later than March 15 of the second year following the year in which the census was taken.

formal objections to the Final Plan have been filed with this court. Except for the division of Pitkin County into House Districts 57 and 61 and that part of the plan which unnecessarily divides Perry Park, we conclude that the Final Plan satisfies the constitutional criteria. We disapprove the Final Plan and return the plan to the Commission for revision, modification, and resubmission to include the technical corrections to the Larimer County and Boulder County plans and the recommended revision of the plan for Perry Park and for reconsideration of House Districts 57 and 61.

## I

■■■ The court's role in reapportionment proceedings is *sui generis.* Our review must be "swift and limited in scope so that elections from the new districts may proceed on schedule." *In re Reapportionment of the Colorado General Assembly,* 647 P.2d 191, 194 n. 6 (Colo.1982) (*"In re Reapportionment I"*). "Our role in this proceeding is a narrow one: to measure the present reapportionment plan against the constitutional standards. The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court." *Id.* at 194 (footnote omitted).

■■■ The constitutional standards we must apply include the assurance of "equal protection for the right to participate in the Colorado political process and the right to vote." *Id.* In reviewing the Final Plan, therefore, we must necessarily take into account federal constitutional standards arising from the Fourteenth[2] and Fifteenth Amendments.[3] *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Lucas v. Forty–Fourth General Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

In formulating and choosing among alternative plans for reapportionment, the Commission was significantly influenced by considerations arising from section 2 of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 (1988). Moreover, two separate objections have been raised by individuals and organizations that the Final Plan itself violates section 2 of the Voting Rights Act.

■■■ Article V, section 48(1)(e), does not explicitly authorize or require this court to determine if the Final Plan conforms to section 2 of the Voting Rights Act. However, the Voting Rights Act applies to state reapportionment or redistricting plans, *Thornburg v. Gingles,* 478 U.S. 30, 34, 106 S.Ct. 2752, 2758, 92 L.Ed.2d 25 (1986), and the Commission concedes that the Final Plan must conform to section 2 as well as the equal protection provisions of the Fourteenth Amendment. We conclude, therefore, that our review of the Final Plan must necessarily consider Voting Rights Act concerns. Our evaluation of the Voting Rights Act issues is, however, strictly circumscribed by the narrow scope of the proceedings, the presumption of good faith and validity we must accord to the Commission,[4] the nature of the evidentiary record

---

Colo.Const. art. V, § 48 (emphasis added).

2. Section 1 of the Fourteenth Amendment provides in part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.
U.S. Const. amend. XIV, § 1.

3. The Fifteenth Amendment provides in part that "[t]he right of citizens of the United States to vote shall not be abridged by the United States or by any State on account of race, color,

or previous condition of servitude." U.S. Const. amend. XV.

4. We note that the makeup of the Commission was effectively nonpartisan in that neither Democrats nor Republicans commanded a majority of the Commission's eleven members. In addition, the Commission held twenty public hearings across the state and formulated numerous preliminary plans and alternate plans in response to suggestions made by members of the public.

[I]f neutral decisionmakers developed the plan [to reapportion congressional districts] on the basis of neutral criteria, if there was an adequate opportunity for the presentation and consideration of differing points of view, and

before us, and our restricted ability to act as a fact finder when material facts are genuinely disputed.

■ In accordance with the Supremacy Clause, U.S. Const. art. VI, cl. 2, and our earlier decisions in *In re Reapportionment I* and *In re Reapportionment of the Colorado General Assembly*, 647 P.2d 209 (Colo.1982) (*"In re Reapportionment II"*), the Final Plan must be consistent with six parameters (in the following hierarchy from the most to the least important): (1) the Fourteenth Amendment Equal Protection Clause and the Fifteenth Amendment; (2) section 2 of the Voting Rights Act; (3) article V, section 46 (equality of population of districts in each house); [5] (4) article V, section 47(2) (districts not to cross county lines except to meet section 46 requirements and the number of cities and towns contained in more than one district minimized); [6] (5) article V, section 47(1) (each district to be as compact as possible and to consist of contiguous whole general election precincts); [7] and (6) article V, section 47(3) (preservation of communities of interest within a district).[8]

No one has claimed that the Final Plan violates the Fourteenth Amendment Equal Protection Clause or the Fifteenth Amendment. Moreover, we conclude that the Final Plan is consistent with the equality of population requirements of article V, section 46. *See* footnote 4, above. The first objections to the Final Plan that we consider arise under the federal Voting Rights Act.

## II

### *Section 2 of the Voting Rights Act of 1965*

Two distinct groups of objectors have raised claims that the Final Plan violates

---

if the guidelines used in selecting a plan were explained, a strong presumption of validity should attach to whatever plan such a process produced.

*Karcher v. Daggett*, 462 U.S. 725, 759, 103 S.Ct. 2653, 2675, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring).

5. Colo.Const. art. V, § 46 provides:

**Senatorial and representative districts.** The state shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population as nearly equal as may be, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.

"The five percent deviation test means that the sum of the percent by which the largest district's population exceeds that of the ideal district and the percent by which the smallest district population falls short of the population of the ideal district must be less than five percent." *In re Reapportionment I*, 647 P.2d at 193 n. 4. The population of the ideal district for each house is determined by dividing the population of the state by the number of districts in that house. *Id.* There are thirty-five senators and sixty-five members of the House of Representatives. According to the 1990 federal census, the population of Colorado is about 3,294,400. The ideal senate district therefore contains 94,126 persons and the ideal house district is 50,683.

In the Senate, the largest district is District 6 which contains 2.79% more persons than the ideal senate district. Senate District 24 is the smallest with 2.11% less population than the ideal district. The overall deviation is therefore 4.90%.

House District 16 is the most populous with 2.45% more people than the ideal house district. House District 60 is the smallest with 2.51% less persons than the ideal district. The overall deviation for house districts is 4.96%.

6. Colo.Const. art. V, § 47(2) provides:

(2) Except when necessary to meet equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts. Within counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible. When county, city, or town boundaries are changed, adjustments, if any, in legislative districts shall be as prescribed by law.

7. Colo.Const. art. V, § 47(1) provides:

(1) Each district shall be as compact in area as possible and the aggregate linear distance of all district boundaries shall be as short as possible. Each district shall consist of contiguous whole general election precincts. Districts of the same house shall not overlap.

8. Colo.Const. art. V, § 47(3) provides:

(3) Consistent with the provisions of this section and section 46 of this article, communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, shall be preserved within a single district wherever possible.

section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 (1988), which provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision *in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.*

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision *are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.* The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered. *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973 (emphasis added). The leading case interpreting section 2 after it was amended in 1982 is *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). *Gingles* involved a vote dilution claim following redistricting and the creation of certain multimember districts in North Carolina. Analysis of a section 2 claim, based on the "totality of circumstances," 42 U.S.C. § 1973(b), is "fact-intensive," *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764. The Senate Judiciary Committee Majority Report which accompanied the bill amending section 2 contained a nonexclusive list of "typical factors," derived from *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973), which were to be considered in the analysis of a section 2 claim:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

S.Rep. No. 417, 97th Cong., 2d Sess. 28–29 (1982), *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07 (footnotes omitted). Factor two, "the extent to which voting in the elections

of the state or political subdivision is racially polarized," arose in *Gingles* as the single most important of these factors.

■■■ In *Gingles*, the Court held that a plaintiff must show the following preconditions in order to establish a violation of section 2 in the use of multimember districts:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district.... Second, the minority group must be able to show that it is politically cohesive.... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, ...—usually to defeat the minority's preferred candidate.

*Gingles*, 478 U.S. at 50–51, 106 S.Ct. at 2766. There are several limitations on actions brought under section 2. First, election devices, such as at-large elections, are not *per se* violations of section 2. Second, the combination of an electoral mechanism and lack of proportional representation does not by itself establish a section 2 claim. Third, the existence of racial bloc voting may not be presumed; the plaintiffs must prove it. *Gingles*, 478 U.S. at 45–46, 106 S.Ct. at 2763–64; *Sanchez v. Bond*, 875 F.2d 1488, 1492 (10th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990).

■■■ One of the key lessons of *Gingles* is that the "ultimate finding of vote dilution" is a question of fact subject to appellate review only under the clearly erroneous standard. *Gingles*, 478 U.S. at 78–79, 106 S.Ct. at 2781. The evidentiary record before us in this original proceeding is sparse. The Commission's resolution of disputed factual issues in the determination of the claims under the Voting Rights Act was not made in an adversarial proceeding with the accompanying safeguards of cross-examination and a full record and should not be overturned because we would reach a different result. If facts material to the resolution of a section 2 claim are in genuine dispute, if it appears from the record that the Commission has made a good faith effort to resolve these disputed facts, and if the Commission has applied the correct legal standard to the facts it has found, we will not reject the Final Plan on Voting Rights Act grounds.

■■■ The first objectors, Blacks for Fair Reapportionment (BFFR), assert that their section 2 claims pertain to House Districts 7 and 8 in Denver. Their proposed plan would incorporate a portion of Adams County and Aurora, a home rule city, into House District 7. It would also shift the common boundary line between House Districts 7 and 8 further to the east. In order to compensate for the loss of population, a small enclave would be carved into Weld County at the northern border of House District 36. These changes would increase the black population in House District 7 from 44.58% (under the Final Plan) to 48.01% (under the objectors' plan), an increase of 3.43 percentage points. Under the objectors' plan, the black population in District 8 would increase from 43.10% to 43.42%, a gain of 0.32 percentage points. These changes are necessary, BFFR alleges, in order to maximize the voting power of blacks and minorities.

The objectors concede that blacks have had success in the past in electing minority candidates in House Districts 7 and 8 over the past approximately fifty years. *Cf. Gingles*, 478 U.S. at 77, 106 S.Ct. at 2780 (per Justice Brennan and one Justice concurring and four Justices concurring in part and concurring in the judgment) (persistent proportional representation in particular multimember district in last six elections demonstrated that the black voting strength in that district was not impermissibly diluted in violation of section 2). The Commission rejected the opponents' plan because it would require the crossing of county lines and city boundaries contrary to article V, section 47(2). In addition, a reply to the BFFR plan was filed which contends that the BFFR plan itself would violate section 2 because it disenfranchises northwest Aurorans and decreases the op-

portunity for minority Aurora citizens to participate in the political process.

In this court, the Commission first contends that BFFR has not shown that the Final Plan violates section 2 because they have not satisfied the first *Gingles* precondition, that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," *Gingles*, 478 U.S. at 50, 106 S.Ct. at 2766. Under BFFR's plan, as under the Final Plan, blacks would remain a minority in House Districts 7 and 8. However, even if this first *Gingles* condition is found not to invariably apply when an objection is made to a single member rather than a multimember district as in *Gingles*, the Commission asserts that the sustained history of black electoral success in Districts 7 and 8 refutes any claim of vote dilution under section 2.

We conclude that resolution of the section 2 claim in favor of the objectors would necessarily involve the finding of material facts that are in genuine dispute. Our examination of the record discloses that the Commission attempted to apply the proper legal standards to the Voting Rights Act claims raised in Districts 7 and 8 and made a good faith effort to comply with section 2 of Act.

The Commission had a report from its own expert that there was very little racial bloc voting in Denver, and that districts in which minorities comprised between forty and fifty percent of the population had a reasonable opportunity to elect the representatives of their choice. The alternate plan submitted by BFFR would require "two or three" additional county splits. These splits could not be justified under article V, section 47(2) unless section 2 required them. Given the only marginal gains in minority population in Districts 7 and 8 under the BFFR plan, we decline to overturn the Commission's finding that House Districts 7 and 8, as drawn in the Final Plan, comply with section 2 of the Voting Rights Act.

The second objection to the Final Plan based on section 2 was filed by Jennie Sanchez and others and relates to a proposal to redraw the boundaries of House District 60 to include "a large and relatively compact group of Hispanic voters in Southern Colorado, including the San Luis Valley and parts of Pueblo and Las Animas Counties." The objectors contend that it would be possible to redraw District 60 "such that it would have an Hispanic voting-age population of 50+ percent."

In a plan suggested by the objectors, District 60 would contain a majority in the Hispanic voting-age population of 50.03%. The suggested plan, however, ignores natural boundaries and splits seven counties. Under the Final Plan, House District 60 preserves the San Luis Valley intact, includes seven whole counties and splits only one county, Las Animas. The Hispanic population in District 60 under the Final Plan is 45.31% of the total population. The Commission asserts that it drew the boundaries of District 60 with Voting Rights Act considerations always in mind and after paying close attention to the wishes of San Luis Valley residents to preserve the Valley intact.

Moreover, the Commission contends that in order to prevail on their claim under section 2, "the minority group must be able to show that it is politically cohesive." *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766. *Cf. Sanchez v. Bond*, 875 F.2d at 1492–97 (plaintiffs failed to demonstrate political cohesiveness among Hispanics in Saguache County and thus the electoral system used to elect Saguache County Commissioners did not violate section 2). The presence or absence of such political cohesion was hotly contested below at the Commission level and in this court. We conclude that the objectors have not made a showing that would enable us to reject the Commission's determination that District 60 as drawn under the Final Plan complies with section 2 of the Voting Rights Act.

### III

Finding that the Final Plan complies with federal law and the equality of population requirement of article V, section 46, we

now review the plan under article V, section 47. The most important concern under section 47 is whether the Final Plan unnecessarily divides counties or cities within counties. *In re Reapportionment II*, 647 P.2d at 210. Next in importance is "the requirement that each district be as compact in area *as possible* and the aggregate linear distance of all district boundaries as short *as possible*, Colo.Const.Art. V, § 47(1)." *In re Reapportionment II*, 647 P.2d at 210–11. Also contained within section 47(1) is the mandate that "[e]ach district shall consist of contiguous whole general election districts." Colo.Const. art. V, § 47(1). The least weighty constitutional consideration is the "preservation *wherever possible* of communities of interest, including ethnic, cultural, economic, trade area, geographic, and demographic factors, Colo. Const.Art. V, § 47(3)." *In re Reapportionment II*, 647 P.2d at 211.

No objection has been raised that the configuration of senate districts in the Final Plan violates article V, section 47(2). Our review of the record reveals no violation of section 47(2) with respect to the senate districts. A number of objections have been raised, however, that the Final Plan for the house districts unnecessarily splits counties or cities, contrary to section 47(2).

 Our examination of the Final Plan as a whole with respect to house districts reveals that, out of the fifty-two counties in Colorado with populations less than that of the ideal house district, six were split.[9] The Commission's justification for each county split was the requirement of equality of population among house districts. The Commission states that Voting Rights Act concerns initially determined the order and manner in which the boundaries were drawn and population was equalized. As we said in *In re Reapportionment I*, 647 P.2d at 197:

> The constitution allows the Commission to divide a county only if necessary to meet the equal population require-

ment. The Commission's justification for some of the county divisions in the plan before us is not as precise as it might be. Nevertheless, substantial equality of population and avoidance of splitting counties cannot always be met simultaneously. When they cannot, the avoidance of split counties must yield. The area of the state in which these conflicts occur is subject to adjustment, and the Commission must have the discretion to choose where the necessary and constitutionally permissible compromises are made.

As in 1982, we conclude that the Commission complied with the constitutional requirement of article V, section 47(2). Similarly, we determine, with two exceptions, that the Final Plan drawn by the Commission complies with the dictates of article V, section 47(1) and section 47(3).

The one exception is the unnecessary but inadvertent split of the community of Perry Park (population 1,000) in Douglas County into House Districts 20 and 64. The objectors propose first that all of Perry Park be included in House District 20, a configuration which they say will not unduly disturb equality of population. Their second alternative would redraw the line between Districts 20 and 64 so as to include most of the rural area of Douglas County in District 20 and the urban and suburban areas of the county in District 64. At oral argument, counsel for the Commission stated that redrawing the boundaries of Districts 20 and 64 in order to preserve intact the Perry Park community would not be a "hard problem" for the Commission. We, therefore, reject this portion of the Final Plan and return the plan to the Commission to redraw the boundaries of House Districts 20 and 64 to conform with article V, section 47(3).

### Pitkin County

 The second portion of the Final Plan that we disapprove is the division of Pitkin County and the City of Aspen into

**9.** The reapportionment plan for house districts which was ultimately approved by the court in 1982 split seven out of fifty-three counties that were too small to comprise a single district. *In re Reapportionment I*, 647 P.2d at 195.

House Districts 57 and 61. The Pitkin County Board of County Commissioners objects to the division of Pitkin County into two house districts and the resulting division that "the City of Aspen and the economic-related and dependent communities of Aspen and Snowmass Village." The Commission asserts that the Pitkin County splits occurred as a result of the need to obtain the required population level in the districts involved.

District 61 is made up of five counties and two parts of counties, all located in a mountainous area of the state. It includes Lake County, with its county seat in Leadville; Park County, with its county seat in Fairplay; Chaffee County, having Salida as its county seat; and the northern part of Teller County, with Cripple Creek [10] as its county seat. All these counties are on the eastern slope. The balance of District 61 consists of the western slope counties of Gunnison, with its county seat in Gunnison; Hinsdale, with Lake City as its county seat, and part of Pitkin, with Aspen as its county seat. It is the division of Pitkin County between House Districts 57 and 61 that concerns us.

District 61 contains 50,329 residents. Of these, 5,297 [11] are from Pitkin County. The remaining 7,364 Pitkin County residents, including a small number of Aspen residents, are placed in District 57, including as well most of Garfield County (county seat in Glenwood Springs), and all of Rio Blanco County (county seat in Meeker) and Moffat County (county seat in Craig). The redistricting boundaries in Pitkin County adversely affect the explicit constitutional criterion of maintaining counties and cities intact. In addition, District 61 lacks compactness. It ranks seventh poorest under both the Schwartzberg test and the Reock test. Visual inspection of the map of District 61 shows that the inclusion of part of Pitkin County as a peninsula jutting out

from the mainland of the district contributes to the lack of compactness of the district as a whole. [12] The division of Pitkin County can only be defended on the basis that it is necessary to meet the paramount equal population requirement of section 46 of article V.

In addition, the preservation of communities of interest criterion of section 47(3) has been seriously compromised by combining the up-valley, eastern part of Pitkin County with other counties across the continental divide. Although this area of Pitkin County is contiguous to Gunnison County, Lake County, and Chaffee County, reference to any highway map discloses that there is no improved road directly connecting principal population centers in Gunnison County to Pitkin County, [13] and the only access from Aspen to the eastern slope counties is across Independence Pass, which, as the Pitkin County objectors point out, is closed for about six months each year. See Colo. Const. art. V, § 47(3).

The Pitkin County objectors also assert a strong community of interest between the residents of the resort City of Aspen and the all but contiguous recreational resort of Snowmass Village, and with other residents of the Roaring Fork Valley, from whom they will be separated by the district boundaries created by the Final Plan. The Commission states that if Pitkin County were not divided, it would be necessary to divide either Summit County or Eagle County in order to achieve substantial equality of population among districts. It does not suggest why such divisions would be equally or less adequate constitutionally than the one adopted.

We conclude that the Commission's explanation for dividing Pitkin County and the City of Aspen, and for the further division of Snowmass Village from Aspen, does not rise to the level of an adequate

---

10. Cripple Creek, however, is not in District 61.

11. The materials submitted do not show the total population of Aspen. It appears likely, however, that the 5,297 persons in District 61 are almost entirely Aspen residents.

12. This same irregularity in district boundaries adversely affects the compactness of District 57 as well.

13. A road across McClure Pass connects Redstone, in Pitkin County, with Paonia, in Delta County, and crosses a remote part of Gunnison County.

factual showing that less drastic alternatives could not have satisfied the equal population requirement of the Colorado Constitution. Furthermore, the explanation does not provide a basis for meaningful judicial review of the Commission's decision. We, therefore, disapprove that part of the Final Plan which divides Pitkin County and the City of Aspen into House Districts 57 and 61. We return that part of the plan for reconsideration, revision, modification, and resubmission. If, after considering alternatives, the Commission concludes that the present Final Plan for Districts 57 and 61 is still constitutionally preferable to the alternatives, it may resubmit the present plan. In that case, the Commission should provide the court with additional information detailing the alternatives considered and the reasons for their rejection.

## IV

We now discuss the remaining specific objections which have been filed to the Final Plan.

### Arapahoe County

A number of objections have been lodged with respect to the boundaries of House District 3. Under the Final Plan, District 3 includes a portion of Denver and then crosses the county line into Arapahoe County. It includes the City of Sheridan and divides the City of Englewood into two House Districts: 3 and 37. The objectors contend that District 3 need not cross the Arapahoe County line in the manner approved by the Commission and that it does so only for political concerns which would allow Denver to keep ten representatives in the House, rather than the nine to which Denver is entitled under the 1990 census.

The Commission points out, however, that even under the Final Plan, Arapahoe County residents comprise a majority in House District 3. Moreover, under both the Final Plan and the alternate Arapahoe County plan, Arapahoe County is split. The objectors have alleged that equal population requirements can be met without dividing cities located in Arapahoe County

into more than one house district, but we note that their alternate plan divides at least as many cities within Arapahoe County as does the Final Plan.

The Arapahoe County objectors also assert that the Final Plan does not preserve communities of interest as required under article V, section 47(3). Our examination of the Final Plan and the Arapahoe County alternate plan, however, convinces us that the Commission complied with constitutional requirements when it drew House District 3.

### City of Westminster

The City of Westminster has filed a statement of opposition to the Final Plan on a number of grounds. The crux of Westminster's argument is that the City, which lies in both Adams and Jefferson Counties, has been subdivided into seven house districts, contrary to article V, section 47. Westminster also objects to House District 62 which runs from the Jefferson County portion of Westminster through Gilpin, Clear Creek, and Summit Counties.

The Commission explains that it began drawing the boundaries of house districts in the south central portion of the state including the San Luis Valley. The Commission started here primarily out of concern for the Voting Rights Act. It then worked its way west and north, completing districts with whole counties where possible. Summit, Clear Creek, and Gilpin Counties do not have a combined population sufficient for one house district, so the Commission crossed into Jefferson County, and included the western edge of Westminster in House District 62. The Commission explicitly subordinated concerns arising under article V, section 47 (unnecessary crossing of county lines or splitting of cities, compactness, and preserving communities of interest) to achieve equality of population under article V, section 46.

The Commission also asserts that a number of reasons made it necessary to place Westminster into seven house districts in apparent violation of article V, section 47(2). First, since Westminster's population exceeds that of an ideal house district,

at least one split was required. Second, since Westminster lies in both Adams and Jefferson Counties, the Commission had to split the City in order to honor the prohibition against unnecessarily crossing county lines. Third, because of concerns under the Voting Rights Act, the Commission initially fixed the boundaries of two districts in the eastern part of Adams County and worked west. Simultaneously, the Commission was moving east out of the mountains in creating District 62. Because of the Commission's choices of where to begin drawing house districts, and in order to bring "closure" to the Final Plan and preserve equality of population, Westminster was split into more parts than if the Commission had proceeded differently.

Placing portions of Westminster into seven house districts is not *per se* unconstitutional. *See In re Reapportionment I,* 647 P.2d at 197 (court approved 1982 reapportionment plan which split Westminster among seven house districts).

The Commission's explanation of why it was necessary to split Westminster into so many house districts could have been stronger and more detailed. However, we accord the Final Plan a presumption of validity when the Commission purports to follow the proper constitutional criteria and we will not "substitute our judgment for that of the Commission's unless we are convinced the Commission departed from constitutional criteria." *In re Reapportionment I,* 647 P.2d at 197. Although not absolutely dispositive, we deem it significant that the Westminster objectors have failed to come forward with a concrete alternative plan for house districts in Westminster. Although the question is close, we conclude that the Final Plan for House District 62 and for the City of Westminster does not violate article V, section 47.

### Montezuma County

 The Bipartisan Committee to Keep Montezuma County Whole asserts that the Final Plan unnecessarily divides Montezuma County into two house districts, contrary to article V, section 47(2), and splits communities of interest, in violation of arti-cle V, section 47(3). The alternate plan for rural counties, including Montezuma County, that the objectors have submitted is called the "Shaw/Whole Rural County Plan." Under this plan, which does not address reapportionment in the "Front Range Metropolitan Corridor," the largest deviation in population that is created is 3.73%. The objectors present "mathematical verification" that it would be theoretically possible to reapportion the Front Range districts so that the largest population deviation from the ideal district would be –0.58%, thus preserving the 5% constitutional deviation cap of article V, section 46. As the Commission has pointed out, however, adoption of the Shaw/Whole Rural County Plan would require state-wide reapportionment, an unacceptably large "ripple effect."

Although not dispositive of the objection now before the court, we note that Montezuma was split into two house districts in the 1982 plan that we ultimately approved. *See In re Reapportionment I,* 647 P.2d at 195. The Commission also states that its Voting Rights Act concerns in drawing the boundaries of District 60 had a "profound influence on the plan for the Western slope," and that once District 60 was fixed a split of Montezuma County was inevitable.

La Plata and Archuleta Counties have a total population of 37,629. The population of Montezuma County is 18,672. These three counties thus have a combined total population of 56,301, approximately ten percent higher than the population of the ideal house district. The Commission contends that if it created a house district comprising La Plata and Montezuma Counties, Archuleta County would have to be combined with Hinsdale and other counties to the north, which would impact the population balances of House Districts 58 and 61. The Montezuma County objectors have not presented an acceptable alternate plan which disproves the Commission's assertions. We find that the Montezuma County split does not offend article V, section 47.

## Baca County

The last specific objection to the Final Plan under article V, section 47(2) is brought by officials of Baca County. They have objected to the Final Plan as it pertains to House Districts 47 and 63. In the Final Plan, House District 47 is comprised of Crowley, Otero, Bent, and Baca Counties, and portions of Las Animas and Pueblo Counties. House District 63 is made up of Elbert, Lincoln, Kiowa, Cheyenne, Kit Carson, Yuma, and Prowers Counties, and the eastern part of Arapahoe County. Thus, three counties are split under the Final Plan.

The alternate plan for District 63 places Baca County with Otero, Bent, Prowers, Kiowa, and Cheyenne Counties and thus splits no counties in that district. The alternate plan fails to demonstrate that the total number of county splits in the state will necessarily be reduced and that the "ripple effects" will not require numerous other changes in the reapportionment scheme. *See In re Reapportionment I,* 647 P.2d at 196 ("It is impossible for us to ascertain in larger counties whether different district configurations might result in a net reduction in the number of house districts which cross county lines."). The Commission explains the districting of eastern Colorado as follows:

> The Commission followed the same basic process in defining [house] districts in eastern Colorado as it did for western Colorado, proceeding east and north from the San Luis Valley and Pueblo area, and completing districts with as many whole counties and as few county splits as possible.

We determine that the Commission complied with article V, section 47, when it placed Baca County in House District 47.

## V

Several objectors challenged the Final Plan under article V, section 47(1)'s requirements of compactness and contiguity.

This provision is subordinate to section 47(2). *In re Reapportionment II,* 647 P.2d at 210–11. The constitutional compactness requirement "concerns a geographic area whose boundaries are as nearly equidistant as possible from the geographic center of the area being considered, allowing for variances caused by population density and distribution, census enumeration districts, and reasonable variations necessitated by natural boundaries and by county lines." *Acker v. Love,* 178 Colo. 175, 177, 496 P.2d 75, 76 (1972). We discussed two objective, quantitative tests for compactness in *In re Reapportionment II:*

> One method of measurement involves comparing each district's perimeter to its area. A smaller perimeter/area ratio indicates compactness.... The second method involves measuring the polar moment of inertia of each district. This method quantifies the distribution of the points in a region around its geographic center. A smaller polar moment of inertia indicates a region in which the points are more closely grouped around the region's geographic center and which is thus more compact.

647 P.2d at 212. In determining the degree of compactness within the Final Plan, the Commission used two somewhat different tests: the Reock test and the Schwartzberg test. According to the Commission, in the Reock Test,

> the computer first determines the two points on the district's boundary that are farthest apart and calculates the area of a circle that would have the line between these two points as its diameter. The polygon area [14] of the district is then divided by the area of that circle to produce a ratio between zero (0) and one (1). The closer the ratio is to one, the more compact the district.

*See* Ernest C. Reock, Jr., *Measuring Compactness as a Requirement of Legislative Apportionment,* 5 Midwest J.Pol.Sci. 70 (1961).[15] The second test for compactness

---

14. "Polygon area" is defined by the Commission as "[t]he sum of the areas of all census units (tracts and blocks) assigned to each district. Polygon area is stated in square miles."

15. The Reock test has been criticized for "giv[ing] a high rating (near 1) to an arbitrarily misshapen district so long as it meanders around within a confined area." H.P. Young,

the Commission used is the Schwartzberg Test, and the Commission described the test as follows:

> Under the Schwartzberg Test, the computer divides the adjusted perimeter of the district (adjusted in accordance with a formula which straightens the boundary by connecting points where three or more units from any district meet) by the perimeter [circumference] of a circle having the same area as the polygon area of the district. The closer the quotient is to one, the more compact the district.

See Joseph E. Schwartzberg, *Reapportionment, Gerrymanders, and the Notion of "Compactness"*, 50 Minn.L.Rev. 443 (1966).[16]

### Senate District 24

■■■ An objection was filed to Senate District 24 as drawn in the Final Plan on the ground that its configuration violates the compactness and contiguity requirements of section 47(1). As accurately described by the objectors, Senate District 24 consists of two somewhat rectangular areas, plus a "flag pole" waving a small "flag."

We need not delve into the Reock and Schwartzberg factors of the alternative plan submitted by the objectors, however, because the alternate plan splits the populations of Thornton and Westminster and the Final Plan does not. The shape of Senate District 24 was thus determined by the configuration of Thornton. Restrictions against the splitting of cities take precedence over compactness concerns under article V, section 47(1). We also find that Senate District 24 does not violate the requirement of contiguity. The "flag" is included in Senate District 24 because it is a contiguous portion of Thornton, joined with the rest of Thornton by measuring the "pole." Contiguous whole general election districts may, therefore, be drawn in Senate District 24, conforming with the requirement of article V, section 47(1).

*Measuring the Compactness of Legislative Districts*, XIII Legis.Stud.Q. 105, 106 (1988).

**16.** The Schwartzberg Test also has its critics. "The Schwartzberg measure is defective in that

### Senate Districts 32 and 35

■■■ The next objection is made to the boundaries of Senate Districts 32 and 35 in Denver. The Commission states that it "was concerned about compactness as well in Denver, although it recognized that its Voting Rights Act obligations were superior to considerations of compactness. The Commission drew the three minority districts (districts 31, 33 and 34) and then divided the rest of Denver [between] districts 32 and 35 in the most compact way possible."

According to the objectors, their alternate plan, the "1–11 Preliminary Denver Senate Plan," was rejected by the Commission for political reasons at the last minute, and the boundary between Districts 32 and 35 was drawn to avoid placing more than one incumbent senator in a senate district.

■■■ In *In re Reapportionment II*, 647 P.2d at 213, we disapproved a portion of the 1982 reapportionment plan because extra-constitutional political considerations had entered into the Commission's deliberations. The districts that we disapproved in 1982 were, therefore, not drawn as compactly as possible and did not preserve communities of interest wherever possible, contrary to article V, section 47(1) and (3). Political considerations are not *per se* improper, however. It is only when partisan factors are allowed an importance equal to or greater than the proper constitutional criteria that a plan is defective. As we said in *In re Reapportionment II:*

> While it is not improper for the Commission to attempt to resolve political conflicts engendered by our disapproval of the election sequencing in the original plan, "[p]roblems created by partisan politics cannot justify an apportionment which does not otherwise pass constitutional muster." *Kirkpatrick v. Preisler*, 394 U.S. 526, 533, 89 S.Ct. 1225, 1230, 22 L.Ed.2d 519 (1969).

it places too much emphasis on the perimeter and not enough on the overall shape." H.P. Young, *Measuring the Compactness of Legislative Districts*, XIII Legis.Stud.Q. 105, 108 (1988).

*In re Reapportionment II*, 647 P.2d at 213. The objectors assert that "[w]hile the 1–11 is not quite as compact in 32, it is much improved over the Final Plan's 35." Calculations under the Reock and Schwartzberg tests belie the objectors' assertion. The Final Plan's Reock and Schwartzberg factors for District 32 are 0.1951 and 3.2673, respectively. The 1–11 Plan's factors for District 32 are 0.1990 and 3.2909, respectively. *Id.* Thus, District 32 under the Final Plan is somewhat more compact than the 1–11 Plan according to the Schwartzberg Test, and somewhat less compact under the Reock Test.

Under the Final Plan, Senate District 35 is a little more compact measured by the Reock Test (0.4803 as opposed to 0.4708 for the 1–11 Plan), and a little less compact measured by the Schwartzberg Test (2.4324 against 2.3110 for the 1–11 Plan).

The objectors have also submitted a second alternate plan for Districts 32 and 35 called the "Pascoe Plan." The Pascoe Plan's District 32 is slightly more compact than the Commission's District 35 under the Reock and Schwartzberg tests. On the other hand, under the Pascoe Plan, Senate District 32 is less compact under the same tests. Since the results of the objective tests for compactness are inconclusive between the Final Plan and either of the objectors' alternate plans, we determine that the Final Plan does not violate article V, section 47(1).

The objectors also assert that while their Pascoe Plan is similar to the Final Plan with respect to population equalization and compactness, it is superior in preserving communities of interest within Denver. They contend that central Denver is much more aligned with east Denver and parts of southeast Denver than it is with southwest Denver, and that southeast Denver has more in common with the southwest than with central Denver. The Commission has responded that these claims are unsubstantiated and that the geographic distance between southeast and southwest Denver makes the objectors' community of interest claim untenable. Moreover, the Pascoe Plan's Senate District 32, which links southeast and southwest Denver, is less compact than the Final Plan's District 32. We conclude, after a comparison of the overall differences between the two plans, that the Final Plan does not violate article V, section 47(3), which in any event is subordinate to the compactness requirements of article V, section 47(1). Since the proposed Final Plan passes constitutional muster, political considerations that may have been involved in the final determination should not vitiate the plan.

### Columbine Knolls South

The final constitutional objection is brought under article V, section 47(3), by the Columbine Knolls South Homeowner's Association, which consists of 680 families. The homeowners state:

> We are presently in Senate District 22, but under the proposed reapportionment we would be moved into Senate District 13. As part of District 13 we would be included in a district that is primarily mountain and rural. We feel that it would be in the best interest of our community to remain in District 22 as this would best meet the reapportionment criteria "Preservation of communities of interest."

The Commission states that placing the Columbine Knolls South area in District 13 was necessary in order to meet the equality of population requirements of article V, section 46. Since preservation of community interest under article V, section 47(3), must yield to equality of population, we find no constitutional violation in this part of Final Plan.

### VI

### Requests for Technical Changes to the Plan

Requests for technical changes in the boundaries of the Final Plan were filed by Boulder, Larimer, and Adams Counties. None of the requested modifications are based on the Colorado Constitution or federal law, and are, therefore, outside the scope of this court's review of the Final Plan which is "to measure the present reapportionment plan against the constitu-

tional standards." *In re Reapportionment I*, 647 P.2d at 194; *see also* Colo. Const. art. V, § 48(1)(e).

The Commission views the changes requested changes by Larimer County and Boulder County as minor, technical, and meritorious. We, therefore, conclude that the Commission should incorporate the technical changes requested by Larimer and Boulder Counties into the Final Plan when it resubmits the plan to this court.

## VII

Accordingly, we disapprove the Final Plan and return the plan for modification or revision of House Districts 57 and 61 to conform to the requirements set forth in this opinion and for resubmission to the court. In addition, the Perry Park portion of the Final Plan should be corrected and the plan is returned to the Commission to redraw the boundaries of House Districts 20 and 64 to conform with article V, section 47(3). The Commission shall also incorporate the technical changes requested by Larimer and Boulder Counties into the Final Plan when it resubmits the plan to this court.

LOHR, J., concurs in part and dissents in part.

QUINN, J., concurs in part and dissents in part, and MULLARKEY, J., joins in Parts I and IIA of the concurrence and dissent.

VOLLACK, J., concurs in part and dissents in part.

MULLARKEY, J., concurs in part and dissents in part, and QUINN, J., joins in the concurrence and dissent.

Justice LOHR concurring in part and dissenting in part:

The majority approves the Final Plan submitted by the Colorado Reapportionment Commission ("Commission") for revising the senatorial and representative districts for the General Assembly of the State of Colorado based on the 1990 federal census, with certain exceptions. These exceptions consist of disapproval of the present division of Pitkin County between two house districts, disapproval of the Perry Park plan, and imposition of a requirement that technical corrections be made to the Larimer and Boulder County plans. Because I am unpersuaded that the Final Plan properly adheres to Colorado constitutional criteria in dividing the City of Westminster into seven house districts, I respectfully dissent in part to the majority opinion.[1] I concur with the opinion in all other respects.

## I.

Article V, § 48(1)(a), of the Colorado Constitution requires that "[a]fter each federal census of the United States, the senatorial districts and representative districts shall be established, revised, or altered, and the members of the senate and the house of representatives apportioned among them, by a Colorado reapportionment commission ...." Sections 46 and 47 of article V of the Colorado Constitution prescribe the criteria by which the Commission is governed in discharging this important public responsibility.[2] The constitutional criteria and their relative importance can be capsulized as follows:

> The paramount criterion is substantial equality of population among the senate districts and among the house districts. Colo. Const. Art. V, § 46. Subordinated only to this requirement is the proscription contained in Colo. Const. Art. V, § 47(2) against the division of counties and cities among districts. Next in order of importance are the standards of compactness and minimum linear boundary distance found in Colo. Const. Art. V, § 47(1). The least weighty of the consti-

---

1. I agree with Justice Quinn's dissent to that same feature of the Final Plan, and join the section of his dissent addressing it.

2. As the majority properly notes, federal constitutional and statutory criteria also play an im-

portant part in the redistricting process. *See* maj. op. at 189–190. The bases for my concerns about the Final Plan do not relate to satisfaction of those criteria.

tutional requirements is the prescription for preservation of communities of interest. Colo. Const. Art. V, § 47(3). By its terms, this requirement is subordinated to the requirements of section 46 and the other requirements of section 47.

*In re Reapportionment of the Colorado General Assembly,* 647 P.2d 191, 200 n. 1 (Colo.1982) (Lohr, J., dissenting); *accord id.* at 193–94 (per curiam); maj. op. at 189–190. Although the various criteria have different levels of importance, each is of constitutional significance and must be given effect by the Commission.

This court too has a constitutionally assigned responsibility. We must review the plan submitted by the Commission and determine whether it complies with sections 46 and 47 of article V of the constitution. Colo. Const. art. VI, § 48(e). In discharging this responsibility, we recognize that the criteria of sections 46 and 47 "are to be viewed as a whole, as a set of firm but general guidelines which allow the Commission some discretion in application." *In re Reapportionment,* 647 P.2d at 194. Our sole concern is with constitutional sufficiency. "The choice among alternative plans, each consistent with constitutional requirements, is for the Commission and not the Court." *Id.; accord id.* at 200 (Lohr, J., dissenting); maj. op. at 189. Although we are cognizant of the difficulty and complexity of the Commission's task, we cannot permit this to obscure the fact that it is the court's duty and responsibility to test the Final Plan for constitutional sufficiency.

## II.

I turn now to examination of house districts 27, 29, 31, 33, 34, 35, and 62, which together encompass the entire City of Westminster. I conclude that the configuration of these districts is constitutionally deficient.

The City of Westminster is a home rule municipality situated in Adams and Jefferson Counties. It has a population of 74,625 according to the 1990 federal census. The population of the entire state of Colorado according to that same census is 3,294,394. Dividing that latter population by the sixty-five members of the Colorado house of representatives, the ideal house district would contain 50,683 persons. Therefore, Westminster must be divided into at least two house districts because its population exceeds the number that can be accommodated in one. The Commission, however, has divided the city among seven different house districts.[3] Under section 47(2) of article V of the Colorado Constitution, "[w]ithin counties whose territory is contained in more than one district of the same house, the number of cities and towns whose territory is contained in more than one district of the same house shall be as small as possible." This language evidences an intent that the Commission, in apportioning the populations of counties, keep cities whole whenever possible.[4] Thus, the fragmentation of Westminster into seven districts, instead of the two theoretically possible, substantially compromises the constitutional value of maintaining city integrity.

The division of the City of Westminster also severely compromises the preservation of communities of interest standard of section 47(3) of article V of the Colorado Constitution. Communities of interest are based on "ethnic, cultural, economic, trade area, geographic, and demographic factors." *Id.* In no one of the seven dis-

3. The city is divided among house districts 27, 29, 31, 33, 34, 35, and 62. One of these districts, district 31, contains only a small portion of Westminster and includes no residents of the city.

4. Arguably, the language of article V, § 47(2), applies specifically only to the situation where a county must be split and directs the Commission in that situation to ensure that no cities are split in the process of dividing the county. (The territory of both Adams and Jefferson Counties is contained in more than one district of the house of representatives; neither county is split within the City of Westminster.) Considered more broadly, however, this constitutional criterion expresses a general intent to maintain the integrity of cities and towns and should be read to disfavor dividing cities and towns under any circumstances except where necessary to satisfy criteria that are assigned greater constitutional significance.

tricts in which Westminster is included does the Westminster population make up a majority. Specifically, the Westminster population is divided among the seven districts as follows:

| | Westminster Population | Total District Population |
|---|---|---|
| District 31 | 0 | 50,546 |
| District 33 | 10,000 | 51,050 |
| District 34 | 9,985 | 51,419 |
| District 35 | 21,654 | 49,491 |
| District 27 | 2,448 | 51,756 |
| District 29 | 14,960 | 51,677 |
| District 62 | 15,578 | 51,721 |

To the extent that the City of Westminster constitutes a single community of interest, as presumably it does for some purposes based on the inclusion of its citizenry within a single governmental unit and the commonality of interests fostered thereby, the constitutional value of preserving communities of interest is compromised by the division of the city into separate districts. The Final Plan compounds this problem by not assigning that community of interest majority representation in any district.

In drawing the boundaries of house district 62, the Commission assigned little weight to the constitutional criteria of compactness and preserving communities of interest. 15,578 Westminster residents reside in district 62, which includes as well other parts of Jefferson County containing 12,573 residents, and all of Gilpin, Clear Creek, and Summit Counties. Gilpin is an eastern slope mountain county having a population of 3,070, with Central City as its county seat. Clear Creek is also an eastern slope mountain county of 7,619 persons, with its county seat in Georgetown. Summit County, with its county seat in Breckenridge, is located across the continental divide from the rest of the district and has 12,881 residents. District 62 has the sixth poorest rating among the sixty-five house districts under the Schwartzberg test for compactness and the tenth poorest rating under the Reock test.[5] Thus, this district

rates at the very low end of the scale for compactness among all the districts in the state of Colorado. In addition, it combines an urban population in Westminster and nearby unincorporated Jefferson County with three small mountain counties. One of these counties is on the western slope. It cannot be doubted that the community of interest criterion has been severely compromised by inclusion of areas of such cultural, economic, trade area, geographic, and demographic diversity within a single district.

> [T]he interests of the mountain communities and those of the suburbs in the metropolitan area are not the same and sometimes are in tension. Similarly, western slope and eastern slope citizens have divergent interests in some areas appropriate for legislative action. Mining, water, and tourism exemplify subjects in which the residents in [such a district] could be expected to have strongly held and widely disparate views. A [representative] predictably will be confronted with dilemmas in efforts to represent citizens with such different interests.

*In re Reapportionment*, 647 P.2d at 203 (Lohr, J., dissenting) (bracketed material substitutes "representative" for "senator"); *see* Colo. Const. art. V, § 47(3). The fact that preservation of communities of interest is lowest on the scale of constitu-

---

5. The compactness ratings for three of the seven house districts that include parts of the city of Westminster rank in the bottom one-third of all the districts under the Reock test, and compactness ratings for four of the Westminster districts rank in the bottom one-third of all districts according to the Schwartzberg test. These tests are explained in the majority opinion at 198–199.

tional criteria does not justify the somewhat dismissive treatment it is accorded by the Commission in giving effect to the paramount criterion of substantial equality of population.

The Commission justifies the division of Westminster and the creation of an elongated and diverse district 62 by the necessity of creating house district 60, principally in the San Luis Valley,[6] consistent with the requirements of the federal Voting Rights Act, 42 U.S.C. § 1973 (1988), and with the substantial equality of population criterion of Article V, Section 46, of the Colorado Constitution. It then candidly admits that beginning from the boundaries of that district it moved north and west and that Westminster was subjected to the limited options that remained when this process encountered constraints resulting from the need to preserve minority communities of interest to the east in Adams County. The majority recognizes the effect that the Voting Rights Act and equal population requirement had on the design of the Final Plan. Maj. op. at 196. It is clear that the division of the City of Westminster was primarily driven by these concerns.

Certainly, the necessity to comply with federal constitutional and statutory requirements and the need to create districts of substantially equal population do impose limitations on the flexibility of the redistricting process. The Commission, however, offers no explanation of other options that were explored or why such options were inferior to the one selected. The process described is not the only way that the constraints of federal and paramount state constitutional requirements could be accommodated. The Commission could have adopted a plan less destructive of constitutional values in the Westminster area and made its compromises elsewhere. The Commission has not explained in more than a conclusory way why the plan adopted is superior to other possible plans.[7]

In the face of the serious incursion on constitutional values represented by the present plan and the absence of a satisfactory showing that it represents the most constitutionally sufficient alternative, I would disapprove the Final Plan as it relates to the City of Westminster. In absence of more detailed explanation from the Commission, our constitutional responsibilities require no less. If in exploring other alternatives or revisiting those originally considered, the Commission is convinced in good faith that the Final Plan represents the best implementation of the constitutional criteria available, I would not foreclose it from resubmitting the present plan together with enough data concerning other alternatives considered to enable us to make an informed judgment concerning the constitutional adequacy of the Final Plan for house districts 27, 29, 31, 33, 34, 35 and 62.

For the foregoing reasons, I respectfully concur in part and dissent in part to the opinion of the majority.

Justice QUINN concurring in part and dissenting in part:

While I agree with the court's resolution of the Voting Rights Act issues, I join Justice Mullarkey's dissent from the court's approval of the reapportionment plan for Senate Districts 32 and 35 in Denver. Justice Mullarkey's detailed description of the circumstances surrounding the Commission's final decision to redraw these districts convinces me that the sole motivating factor for the configuration was the preservation of incumbency—a factor that is nowhere mentioned in the Colorado Constitution and is offensive to the spirit of the Commission's constitutional mandate.

I write separately to dissent from the court's opinion insofar as it approves the fragmentation of the City of Westminster

---

**6.** Not all of the counties contained in house district 60 are part of the San Luis Valley.

**7.** I agree with Justice Quinn that it is the Commission's burden to provide an adequate factual showing that a deviation from constitutional criteria was constitutionally necessary. Many

objectors lack the resources available to the Commission to devise alternative plans. I therefore do not attach the significance that the majority does to the fact that objectors do not propose constitutionally superior alternatives. *See* maj. op. at 197.

into seven house districts (House Districts 27, 29, 31, 33, 34, 35, and 62) and insofar as it sanctions the splitting of Montezuma County into two house districts (House Districts 58 and 59).

## I.

I agree with the proposition that the most important criteria for evaluating a reapportionment plan are the United States Constitution, particularly the Fourteenth and Fifteenth Amendments, and the Voting Rights Act of 1965. This court's role in evaluating a claim under § 2 of the Voting Rights Act, however, is extremely limited due to the nature of the record before us. That record was not developed in an adversarial proceeding, nor was the factual basis for the reapportionment plan subjected to sworn testimony or the crucible of cross-examination. Because a Voting Rights Act claim requires a fact-specific record that can only be adequately developed in the procedural and evidentiary framework of an adversarial proceeding, see *Thornburg v. Gingles*, 478 U.S. 30, 46, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986), I do not consider this court's resolution of those claims preclusive of a challenge to the reapportionment plan in a formal adversarial proceeding initiated under the Voting Rights Act. Because I do not read the court's opinion to preclude such a challenge, I join Part II of the opinion.

With that said, I turn to the issues relating to the City of Westminster and Montezuma County.

## II.

Sections 46 and 47 of Article V of the Colorado Constitution establish a hierarchy of criteria applicable to a reapportionment plan. Foremost among those criteria is the requirement of substantial equality of population among senate and house districts. Colo.Const., Art. V, § 46. This equality-of-population requirement is designed to ensure the one person-one vote principle of federal constitutional jurisprudence originating in the United States Supreme Court's decisions in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). Section 47 of Article V sets forth three additional criteria for a constitutionally viable reapportionment plan. These criteria, listed in the order of importance, are: first, the proscription against dividing counties and cities among districts except when necessary to satisfy the equal population mandate, Art. V, § 47(2); second, the requirement of compactness, pursuant to which "each district shall be as compact as possible and the aggregate linear distance of all district boundaries shall be as short as possible," Art. V, § 47(1); and third, the mandate for preserving communities of interest within a single district on the basis of "ethnic, cultural, economic, trade area, geographic, and demographic factors," Art. V, § 47(3).

Although the equality-of-population requirement is the centerpiece of the reapportionment criteria, it is by no means the exclusive requirement and is certainly not intended as a warrant to ignore or evade the other constitutional requirements. Justice Lohr cogently made that point when he dissented to this court's opinion approving the 1982 reapportionment plan:

What I would make explicit is that our task is not fully satisfied by assuring that districts are of substantially equal population. Our state constitution imposes additional constraints upon the reapportionment process in Colo. Const. Art. V, § 47. Full discharge of our obligation requires that we also assure that these requirements are met. Further, as the majority recognizes, the standards prescribed by Colo. Const. Art. V, §§ 46 and 47 do not constitute an undifferentiated set of constraints that the Commission may freely balance against each other. Rather, a clear, if not rigid, hierarchy of precedence is contemplated. Thus, where it is not possible to satisfy all of the criteria prescribed by Art. V, §§ 46 and 47, our task is to insure that the Commission has resolved these conflicts in a manner which protects this constitutionally mandated hierarchy of precedence.

*In re Apportionment of Colorado General Assembly,* 647 P.2d 191, 200 (Colo.1982) (Lohr, J., dissenting) (footnote omitted). Furthermore, the Commission's decision in choosing among competing alternatives is entitled to some deference, but as Justice Lohr again explained, that deference is limited:

> In this connection, I note that the findings of the Commission are entitled to deference. The complex task facing the Commission requires no less. However, when an objector demonstrates to the court, by alternative plan or otherwise, (1) that the Commission could have complied with all the reapportionment requirements where it did not, or (2) that the Commission unnecessarily failed to respect the constitutional hierarchy of precedence, deference to Commission expertise is no longer appropriate. At that point we would be remiss in our responsibility if we did not disapprove the noncomplying feature of the plan or, at a minimum, require a further explanation of the Commission's choice.

*Id.* at 200.

The Commission, therefore, cannot legitimize a significant deviation from constitutional criteria by nothing more than an *ipse dixit* proclamation that the deviation was necessary either to comply with federal standards or to equalize the population among districts. The Commission's burden, in my view, is to provide an adequate factual showing that the deviation was constitutionally necessary. Only in this way will the constitutional criteria retain vitality and will meaningful judicial review be possible.

The Commission's plan fails to demonstrate the constitutional necessity of significant deviations from controlling constitutional criteria in the following two instances.

### A. Westminster House Districts

The City of Westminster, which has a population of approximately 75,000, is divided between Jefferson and Adams Counties. The reapportionment plan divides the city among House Districts 27, 29, 31, 33, 34, 35, and 62, with the Jefferson County portion of Westminster being subdivided among three house districts and the Adams County portion of the city being subdivided among four house districts. Westminster objects to the plan as violative of the prohibition against dividing cities among districts except when necessary to equalize the population, Colo. Const. Art. V, § 47(2), the requirement of compactness, Colo. Const. Art. V, § 47(1), and the need to preserve communities of interest, Colo. Const. Art. V, § 47(3). Westminster's objections, in my view, are well taken.

Because Westminster exceeds the ideal population of 50,683 for a house district, and because the city is located in two counties, some splitting of the city is necessary if for no other reason than to comply with the constitutional prohibition against crossing county lines in forming districts. Colo. Const. Art. V, § 47(2). To say as much, however, falls far short of justifying the fragmentation that has occurred here. As Justice Lohr points out in his dissent, none of the seven Westminster districts contains a majority of Westminster citizens. I would hold that where, as here, a city with a population in excess of the ideal population for a district is divided into seven districts, one of the districts, at the very least, should contain a majority of city residents. Without that requirement, there is a substantial risk of dissipating existing communities of interest attributable to the city's identity as a political entity.

The Commission attempts to justify its treatment of Westminster by emphasizing that it started house-district reapportionment in the San Luis Valley in order to ensure adequate minority representation in House District 60 and eventually proceeded north to achieve the same goal in House Districts 7 and 8 in Denver. The Commission's concern in ensuring minority representation in other districts, necessary and laudable as that concern is, does not convince me that the need to absorb the so-called "ripple effects" generated by compliance with the Voting Rights Act justifies the Commission's decision to divide a city of approximately 75,000 into seven different districts. If absorption of "ripple ef-

fects" is to be a palliative for deviating from the constitutional hierarchy of precedence established by the Colorado Constitution, then cities with substantially larger populations than 75,000 would seem to be better able to contain the ripples.

Section 47(2) of Article V expressly prohibits, except where necessary to meet the equal population requirement, the splitting of cities whose territory lies in more than one district of the same house in cases where the county in which the city is located is split into more than one district. If the number of "split cities" within a "split county" is to be minimized, it is axiomatic that a city within a "split county" must not be unnecessarily split among different districts. This court's approval of a similar fragmentation of Westminster ten years ago, *In re Reapportionment*, 647 P.2d at 197, does not constitute a judicial writ for the perpetual dismemberment of Westminster.

In addition to violating § 47(2) of Article V, the Commission's plan evades the compactness requirement of § 47(1) of Article V. House District 62, of which Westminster is a part, is a long, narrow district that is bisected by Interstate Highway 70 and stretches from north-central Westminster on the east to Frisco on the west. Although the Commission contends that it subordinated the compactness requirement to the paramount equal population requirement, I see nothing in the Commission's report adequately establishing that the unusual configuration of House District 62 was essential to achieve equality of population.

I am also at a loss to reconcile the boundaries of House District 62 with the constitutional requirement that "communities of interest" be preserved within a single district wherever possible. Colo. Const. Art. V, § 47(3). House District 62 consists primarily of mountain towns whose primary economic interests are linked to the tourist industry. Westminster is basically an urban "bedroom" community of the Denver metropolitan area. Any representative from House District 62 must expect to encounter considerable difficulty in reconciling the interests of such a geographically varied area. I have a similar difficulty in reconciling the fragmented city with the requirements of the Colorado Constitution.

### B. Montezuma County House Districts

The reapportionment plan splits Montezuma County in half between House Districts 58 and 59. House District 58 includes the counties of Dolores, Montrose, San Miguel, and Ouray, and the northern portion of Montezuma County. House District 59 lies south of House District 58 and includes the counties of Archuleta, La Plata, and San Juan, together with the southern portion of Montezuma County. The Commission justifies the splitting of Montezuma County on the basis that, once the boundaries of House District 60 in the San Luis Valley were fixed, the split of Montezuma County was necessary to achieve equality of population in both House Districts 58 and 59. According to the Commission, it could not combine Montezuma County (population 18,672) with La Plata and Archuleta counties (total population 37,629) because the total population of that district would be 56,300 and thus greater than the population level of 50,683 applicable to an ideal house district.

The Bipartisan Committee to Keep Montezuma County Whole objects to the plan as violative of the constitutional prohibition against splitting counties except to achieve equality of population and submits an alternative plan, pursuant to which District 59 would be comprised of Montezuma, La Plata, and Dolores Counties, and District 58 would consist of San Juan, Ouray, San Miguel, Montrose, Delta, and the southernmost tip of Mesa County. The Commission dismisses the alternative plan by stating that it might have adverse effects on minority representation in front range districts and would not totally eliminate the splitting of counties.

In my view, the alternate plan illustrates that there is an alternative to splitting a sparsely populated rural county such as Montezuma County in order to avoid the so-called "ripple effects" of compliance with the Voting Rights Act. It bears re-

peating here that the absorption of "ripple effects" can best be achieved by utilizing densely populated cities for that purpose rather than rural counties where the community of interest is often robust and where the county frequently is the primary provider of governmental services. To be sure, the preservation of communities of interest is the lowest constitutional priority, but that priority nonetheless has a role to play in the constitutional scheme. I am not satisfied that the Commission has made an adequate showing that splitting Montezuma County was necessary to achieve the more important and superseding constitutional requirement of equality of population.

I accordingly join Justice Mullarkey's dissent from the court's approval of the Commission's plan for Senate Districts 32 and 35 in Denver, and I further dissent from the court's approval of the Commission's plan for House Districts 27, 29, 31, 33, 34, 35, and 62 in Westminster and House Districts 58 and 59 in Montezuma County.

MULLARKEY, J., joins Parts I and IIA of this concurrence and dissent.

Justice VOLLACK concurring in part and dissenting in part:

The majority approves the Final Plan submitted by the Colorado Reapportionment Commission but disapproves of that portion of the plan which divides Pitkin County and the City of Aspen into House Districts 57 and 61.[1] In my opinion, the Commission has satisfied the requirements of sections 46 and 47 of Article V of the Colorado Constitution and the mandates of the Voting Rights Act of 1965 with respect to Pitkin County. Although the division may not be perfect, in my opinion it is an honest and good faith effort to apportion one hundred seats in the legislature. The division thus comports with United States and Colorado constitutional requirements, and affords fair representation to all Colorado citizens. Accordingly, I disagree with the majority's rejection of Districts 57 and 61, and dissent to the remand of that part

of the plan for revision, modification, and resubmission.

## I.

The Pitkin County Board of County Commissioners objects to the division of Pitkin County into two House Districts, 57 and 61, on the grounds that the City of Aspen and Snowmass Village would be divided into two different house districts. The Commission found that Pitkin County, as with Montezuma County, is one of only six split counties with a population smaller than the ideal in the Final Plan for the House. The Commission determined that the split was necessary in order to achieve equality of population in House Districts 57 and 61. The only alternatives available to the Commission were to split either Summit County or Eagle County in District 61, in lieu of the Pitkin County split. The majority concludes that the Commission failed to adequately demonstrate why alternate plans could not have satisfied the equal population requirement of the Colorado Constitution. Maj. op. at 195. Absent resubmission of the present plan, the majority's finding does not eliminate the need to split a county; it only shifts the split to a neighboring county.

As presented by the Commission, House Districts 57 and 61 meet the paramount constitutional criteria of equality of population. The Commission legitimately premised its plan on the mandate of equality of population. The Commission was not unaware of the goal of avoiding county or municipal splits under section 47 of Article V of the Colorado Constitution. Section 47(2), however, is expressly subordinated to the equality of population requirement set out in section 46. The Commission's plan must be deemed constitutional.

## II.

The role of this court in reapportionment proceedings is to measure the Commission's proposed reapportionment plan against constitutional standards. *In re Re-*

1. The majority also remands the plan with directions to make technical corrections to the

Larimer and Boulder County plans and to revise the Perry Park plan.

*apportionment of Colorado Gen. Assembly,* 647 P.2d 191, 194 (Colo.1982). The *choice* among alternative plans, each consistent with constitutional requirements, is for the Commission and not this Court. *Id.* This court's review is thus narrow and limited in scope. *Id.* This court's prime consideration in reviewing the Commission's plan is ascertaining whether the plan meets the equality of population test in the proposed senate and house districts as required by article V, section 46, of the Colorado Constitution:

> **Section 46. Senatorial and representative districts.** The State shall be divided into as many senatorial and representative districts as there are members of the senate and house of representatives respectively, each district in each house having a population as nearly equal as may be, as required by the constitution of the United States, but in no event shall there be more than five percent deviation between the most populous and the least populous district in each house.[2]

Article V, section 47, of the Colorado Constitution supplies three additional criteria for evaluating legislative districts which are subordinate to the mandate of section 46. Pitkin County's objections are based on the subordinate provisions of section 47(2), which provide in pertinent part: "Except when necessary to meet the equal population requirements of section 46, no part of one county shall be added to all or part of another county in forming districts." Equality of population under section 46 is of paramount concern; division of counties under the additional criteria in section 47(2) is secondary. Apportioning legislative districts based on factors other than population equality violates the Fourteenth Amendment Equal Protection Clause. *See Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); *Lucas v. Forty–Fourth Gen. Assembly of Colorado,* 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

It is undisputed that, in order to achieve equality of population as to Districts 57 and 61, at least one county must be split. Whether Pitkin, Summit, or Eagle County is to be split is not a decision for this court to make. The majority states that the Commission does not suggest why Eagle or Summit County divisions "would be equally or less adequate constitutionally than the one adopted." Maj. op. at 195. The majority's concerns exceed the purview of this court's review in a reapportionment proceeding. *In re Reapportionment of Colorado Gen. Assembly,* 647 P.2d 191, 194 (Colo.1982). Our narrow review limits us to measuring the proposed plan against constitutional requirements. *Id.*

### III.

The United States Supreme Court's decisions in *Reynolds* and *Lucas* hold that "as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature *must* be apportioned on a population basis." *Reynolds v. Sims,* 377 U.S. 533, 568, 84 S.Ct. 1362, 1385, 12 L.Ed.2d 506 (1964). "[T]he constitutional test for the validity of congressional districting schemes [is] one of substantial equality of population among the various districts established...." *Id.* at 559, 84 S.Ct. at 1380. All that is required under "the Equal Protection Clause [is] that a State make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Id.* at 577, 84 S.Ct. at 1390.

The Commission's proposed plan satisfies this constitutional test. The Commission applied two tests, the Schwartzberg and Reock, to all proposed districts. The Commission also evaluated the ethnic breakdown coupled with voting population of all proposed districts. The Commission subjected the range of district populations to statistical deviation tests. I am compelled to conclude that the Commission thus made

**2.** The five percent deviation test means that the sum of the percent by which the largest district's population exceeds that of the ideal district, and the percent by which the smallest district population falls short of the population of the ideal district, must be less than five percent. *In re Reapportionment of Colorado Gen. Assembly,* 647 P.2d 191, 193 n. 4 (Colo.1982).

an honest and good faith effort to construct districts with respect to the entire plan.

## IV.

The Commission—comprised of five Democrats, five Republicans, and one Independent—submitted a plan to reapportion one hundred seats of the General Assembly. Of the one hundred seats reapportioned, the majority objects to one split: the Pitkin County split. Applying the constitutional requirements of section 46 (population), the Commission considered the alternative of splitting either or both Eagle and Summit County in lieu of Pitkin County. The Commission's resolution of the problem is reflected in its plan, splitting Pitkin County, which meets the paramount criterion of equality of population among the districts. This court has previously recognized that "substantial equality of population and avoidance of splitting counties cannot always be met simultaneously. When they cannot, the avoidance of split counties must yield." *In re Reapportionment of Colorado Gen. Assembly*, 647 P.2d at 197.

Since the Commission's plan met the constitutional standards, we should not exceed our narrow role to ensure that the equal population mandate is not violated. In review of all the objections to the plan, I find that, while the plan is not perfect, it is the result of the Commission's honest, good faith efforts, and should be approved by this court under our limited scope of review.

Justice MULLARKEY concurring in part and dissenting in part:

The majority approves the reapportionment plan as adopted by the Colorado Reapportionment Commission (Commission) over certain objections which were raised as to the new boundaries of senate districts 32 and 35. Because it is unfortunately clear from the record that incumbency considerations alone controlled the Commis-

sion's final decisionmaking as to the redistricting of these two senate districts in contravention of the constitution, I respectfully dissent. When, as here, the Commission rejects a plan solely because of incumbency considerations and approves an amended plan which is not demonstrably superior to the original plan under any of the constitutional criteria, then this court must reject the final plan.

Although this court's role in the reapportionment process has been described as "narrow," *In re Reapportionment of Colo. Gen. Assembly*, 647 P.2d 191, 194 (Colo.1982) (*Reapportionment I*), it is a role of fundamental importance and must be performed carefully in light of the purpose and intent of the reapportionment section of our constitution. *Colo.Const.* Art. V, § 48. The constitutional amendment establishing the Commission was an initiated amendment adopted by the People of Colorado in 1974. By this amendment, the People removed the power and responsibility for legislative reapportionment from the General Assembly and placed it in a separate body which is to function as a nonpartisan Commission. The intent of the amendment was to:

clarify the present constitutional requirement for compact districts by providing that the "... aggregate linear distance of all district boundaries shall be as short as possible." The intent of the [amendment is] to avoid irregularities in district boundary lines which may be placed in a reapportionment plan for reasons not related to natural boundaries, population requirements, and census and local government boundaries.

Legislative Council of the General Assembly, *An Analysis of the 1974 Ballot Proposals*, Research Publication No. 206 (1974), at p. 28.[1] The constitutional criteria include substantial equality of population among the senate and house districts, *Colo. Const.* Art. V, § 46; no unwarranted division of counties, *Colo.Const.* Art. V, § 47(2); as much compactness as possible,

---

1. *See Carrara Place v. Bd. of Equalization*, 761 P.2d 197, 203 (Colo.1988) ("The legislative council's interpretation, while not binding, provides

important insight into the electorate's understanding of the amendment when it was passed.").

*Colo.Const.* Art. V, § 47(1); and wherever possible the preservation of communities of interest, *Colo.Const.* Art. V, § 47(3). *In re Reapportionment of Colo. Gen. Assembly,* 647 P.2d 209, 210–11 (Colo.1982) (*Reapportionment II*).[2] Although substantial equality of population is the "paramount criterion for testing the constitutional sufficiency of a reapportionment plan," *Reapportionment I* at 193, that criterion alone does not prevent gerrymandering. Hence, the constitution provides the additional neutral criteria designed to minimize gerrymandering. *Davis v. Bandemer,* 478 U.S. 109, 168 n. 5, 106 S.Ct. 2797, 2802 n. 5, 92 L.Ed.2d 85 (1986) (Powell, J., concurring in part and dissenting in part) ("Advances in computer technology achieved since the ['one person, one vote'] doctrine was announced have drastically reduced its deterrent value by permitting political cartographers to draw districts of equal population that intentionally discriminate against cognizable groups of voters. For 'one person, one vote' to serve its intended purpose of implementing the constitutional mandate of fair and effective representation, therefore, consideration also must be given to other neutral factors.") (citation omitted).

With the exception of preserving communities of interest, the law existing before the 1974 amendment required the General Assembly to reapportion the districts according to much the same neutral criteria. Thus, the major change introduced by the amendment was the establishment of the Commission which is to be, in the Commission's words, "a politically neutral body." *See* Commission, Response to Objections to Final Plan, at 1. By vesting reapportionment power in the Commission, the amendment intended:

> to reduce the impact that partisan politics can have on the drawing of legislative district boundaries, through the placement of the commission outside the legislative branch and through the re-

quirements for appointment of commission members by all three branches of state government. The [amendment's] more stringent requirements for consideration of communities of interest, for compact districts, and for minimization of the splitting of cities and towns, and the public visibility of the activities of the reapportionment commission would tend to reduce the gerrymandering of legislative districts.

*1974 Ballot Analysis,* at 29–30. Plainly, then, discontent with the General Assembly's reapportionment track record, which was prone "to endless battles over redistricting and to enmity among state lawmakers," *id.* at 30, was the major motivation which led to the adoption of the amendment. In sum, by re-affirming and clarifying the criteria for redrawing the districts and by creating the Reapportionment Commission itself, the amendment minimized considerations of incumbency from the decision-making process of reapportionment.[3] If, as we said in *Reapportionment I* at 194, communities of interest is the least weighty of the reapportionment criteria, incumbency ranks even lower. It has no acknowledged status as a criterion under the amendment and, indeed, is one of the perceived evils which caused the voters to remove reapportionment from the hands of the incumbent legislators.

According to the Commission, the Denver senatorial districts posed certain problems. Because of population shifts, Denver was slated to lose one senate district, dropping from six districts to five. After the Commission drew three "minority" districts (senate districts 31, 33, and 34), the Commission then "divided the rest of Denver" into two districts, senate districts 32 and 35. Commission, Legal Memorandum and Explanatory Materials in Support of Final Plan, at 29.

The original plan for senate districts 32 and 35, computed on January 11, 1992, and

---

**2.** In addition to these criteria, redistricting must also meet the requirements of the federal constitution and the federal Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 (1988).

**3.** *See* Bernard Grofman, "Criteria for Districting: A Social Science Perspective," 33 *UCLA L.Rev.* 77, 151 (1985) (describing "incumbent-centered partisan bias" as the antithesis of redistricting based on neutral factors and as "a prime tool of political gerrymandering.").

approved by the Commission before noon on January 13, 1992 (1–11 plan), divided the rest of Denver so that three Denver incumbents were placed in one district, namely district 32, with district 35 embracing no incumbent. The vote for the 1–11 plan was eight votes in favor to three opposed. On the same day, after lunch, the Commission reconsidered and voted six to five to redraw the rest of Denver, this time placing two democratic incumbents in one district and a republican incumbent in the other district. The Summary of Meeting of the Commission meeting for January 13, 1992 states:

*11:47 [a.m.]—Denver Senate Districts*

Mr. Monaghan made a motion to adopt the 1–11 Senate plan as the commission's final plan, with the exception of Pueblo County. Sen. Wells made a substitute motion to adopt the WELLS/VI plan for Denver. The substitute motion failed on a 5–6 roll call vote.

Mr. Monaghan renewed his motion to adopt the 1–11 senate plan as the commission's final plan. The motion passed on a 8–3 roll call vote.

*12:00 [noon]*

The meeting was recessed.

*12:50 [p.m.]—[meeting reconvened]*

\* \* \* \* \* \*

*1:13 [p.m.]* ...

Mr. Ritchie, having voted on the prevailing side, made a motion to reconsider Denver Senate districts and adopt the WELLS/VI plan. Mr. Monaghan made a substitute motion to adopt the 12–19 plan as the final plan. The substitute motion failed on a 5–6 roll call vote. The original motion carried on a 6–5 roll call vote.

As indicated by the summary, the post-luncheon division of the rest of Denver, known as the Wells plan, was incorporated in the final plan. News reports summarized the Commission's action as follows:

One last-minute adjustment yesterday changed an earlier commission decision to put two incumbent senators, Republi-

can Dottie Wham and Democrat Pat Pascoe, in the same Denver district.

Instead, Pascoe wound up in the same Senate district with Democrat Ray Peterson, who is halfway into a four-year term. Pascoe loses that face-off, because her current term ends in 11 months.

*Denver Post,* January 14, 1992, at p. 3B.

In a Senate district dispute, the commission voted narrowly to place Sen. Dottie Wham in her own south Denver district and put two Denver Democrats together in another—Sens. Pat Pascoe and Ray Peterson. Peterson, who has three years to go in his term, will automatically keep his seat next year because Pascoe's term has expired.

*Rocky Mountain News,* January 14, 1992, at p. 16. The vice-chair of the Commission, Gene R. Nichol, dissented from the Commission's final plan as to the senate districts because he concluded that " 'a constitutional standard the Commission is required to obey—compactness—was sacrificed for political concerns not within our charge.' " *Denver Post,* February 8, 1992 at p. 7B. The political concern was the " 'desire to protect the incumbent.' " *Rocky Mountain News,* Jan. 14, 1992, at p. 16.

The influence of incumbency is the only reason apparent on the record for the change in the boundaries of senate districts 32 and 35. No supportive evidence to the contrary was presented by the Commission in its briefs. There is no evidence showing how the last-minute Wells amendment to the final plan enhanced any of the specific reapportionment criteria provided in the constitution.[4]

The Commission argues that the final plan for senate districts 32 and 35 is at least as compact as the rejected 1–11 plan. Compactness is one of the constitutional criteria which each district must meet as much as possible. *Colo.Const.* Art. V, § 47. The Commission used two computational tests, the so-called Reock and

---

**4.** *See* Art. V, § 48(1)(e), which provides that the "supreme court shall adopt rules for [its review] proceedings *and for the production and presen-* *tation of supportive evidence for such [final] plan."* (Emphasis added.)

Schwarzberg tests, to derive a mathematical measure of compactness. Although each test has been criticized, the gist of each test is that the closer the derived measure approaches the value of 1.0 the more compact the area measured. As redistricting proceeded and different boundaries were considered, the Commission computed the numerical values of compactness for the various proposed districts under both tests.

The last-minute Wells amendment to the final plan did not improve the compactness of the two senate districts by which the Commission divided the rest of Denver. The numerical values of compactness derived for senate districts 32 and 35 under the different plans are not disputed. Under the 1–11 plan, the Reock and Schwarzberg values for senate district 32 are 0.1990 and 3.2909, respectively. Under the final plan as amended, the Reock and Schwarzberg values for senate district 32 are 0.1951 and 3.2673, respectively. Thus, under the 1–11 plan, senate district 32 is more compact according to the Reock test but less compact according to the Schwarzberg test.

Under the 1–11 plan, the Reock and Schwarzberg values for senate district 35 were 0.4708 and 2.3110, respectively. The final plan's Reock and Schwarzberg values for senate district 35 are 0.4803 and 2.4324, respectively. Thus, under the 1–11 plan, senate district 35 is less compact according to the Reock test but more compact according to the Schwarzberg test.

The Commission states that this contrast and comparison of the test values of compactness between the different plans yields inconclusive results and that therefore the Commission is entitled to a presumption in favor of the final plan. However, no such presumption attaches when the Commission adopts a certain plan which satisfies the constitutional criterion of compactness and then rejects that plan in order to protect incumbency. This is especially true when the Commission cannot demonstrate

that the eleventh-hour change improves the final plan by increasing compactness or compliance with any other constitutional criteria.[5]

Thus, in my view, when districts are redrawn after holding the public hearings which are required under § 48 and such changes are not supported by any evidence that a constitutional criterion was more closely adhered to or met, the final plan is not entitled to deference but should be subjected to a more exacting level of review by this court. Direct evidence of the determinative influence of incumbency (influence which the Commission admits in this case) requires this court to disapprove the offending amendment and to reinstate the original boundaries which were fully supported by evidence of adherence to constitutional criteria. By lending its approval to senate districts 32 and 35 as submitted by the Commission, this court endorses a plan which was designed solely for the protection of incumbency. The voters refused to allow reapportionment decisions to be controlled by incumbency considerations and so should we.

Accordingly, I dissent.

QUINN, J., joins in this concurrence and dissent.

5. Although the absolute values of the differences in the two tests may be incommensurable, the final plan's net gain over the 1–11 plan in Reock compactness between districts 32 and 35 is 0.0056, which is less than the final plan's net loss from the 1–11 plan in Schwarzberg compactness between districts 32 and 35, which is 0.0878.